David KASS, Plaintiff and Counterclaim Defendant,

v.

WILLIAM NORWITZ CO., and William Norwitz, Defendants and Counterclaim Plaintiffs.

Civ. No. 79–3099.

United States District Court, District of Columbia.

July 31, 1980.

David Epstein, Washington, D. C., for plaintiff and counterclaim defendant.

Christopher Sanger, Washington, D. C., for defendants and counterclaim plaintiffs.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

*Summary*

Plaintiff brings this action against his former employer, William Norwitz, Co., Inc., and its Chairman of the Board, William Norwitz, for breach of his twenty year employment contract. Plaintiff seeks benefits allegedly owed him for calendar year 1978 and for the remaining eleven years of the contract, as well as punitive damages. Defendants counterclaimed against plaintiff for breach of contract and for compensation allegedly overpaid plaintiff. Defendants also joined, and subsequently voluntarily dismissed, plaintiff's present employer as a third-party defendant. This action is now before us on cross-motions for partial summary judgment. For the reasons discussed below, we deny all pending motions for summary judgment.

### The Facts

Plaintiff David Kass entered a twenty-year executive employment contract with defendant William Norwitz Company, Inc.[1] on November 5, 1968, effective January 1, 1969. Despite the 20 year term of the contract, plaintiff was discharged by defendants on March 1, 1979. At issue in the instant action is an interpretation of the contract to determine whether the agreement was breached by any party.

The following five provisions of the contract, which was drafted by defendants, are relevant to this action:

(a) Clause 1 ("Term of Agreement") provides that plaintiff shall be employed by the defendant company as an Executive for a term of twenty years, beginning on January 1, 1969.

(b) Clause 2 ("Compensation") provides that plaintiff shall receive an annual salary of $25,000.

(c) Clause 3 ("Additional Compensation") provides that in addition to his annual salary, plaintiff shall receive a percentage of the "net profits" of the company, after payment of salaries to the Partner or Partners of $70,000 per year. The percentage share of the "net profits" plaintiff would receive under the contract ranged from a low of 10% at the close of his first year of employment to a high of 33 and ⅓% for each calendar year after (but not including) his fifth year of employment.

(d) Clause 3 ("Additional Compensation") also provides that if the defendant company "shall deem that the Executive be disassociated," he shall receive $5,000 severance pay in lieu of any further compensation.

(e) Clause 5 ("Restrictive Covenant") provides that during the life of the contract and for three years thereafter, plaintiff may not engage in or have a financial interest in any business producing, manufacturing, or distributing any product similar to those produced, manufactured, or distributed by the company in or within 40 miles of Washington, D. C.

This action has its origins in a dispute over the meaning of "net profits" in Clause 3 of the contract, which dispute led to plaintiff's summary discharge by defendants on March 1, 1979. This clause provides in pertinent part:[2]

3. *Additional Compensation.* In addition thereto, the Executive shall receive a share of the net profits of the Company, after payment of salaries to the Partner or Partners (of Seventy Thousand Dollars

---

1. At the time the contract was entered, defendant William Norwitz Company, Inc. was a District of Columbia partnership doing business as William Norwitz Company. Defendant company was incorporated on June 9, 1971.

2. The contract is attached as Exhibit A of plaintiff's complaint.

($70,000.00) per year), payable thirty days after the annual audit, on the following schedule:

10% for the period ending December 31, 1969

15% for the period ending December 31, 1970

20% for the period ending December 31, 1971

25% for the period ending December 31, 1972

30% for the period ending December 31, 1973

33⅓% for each calendar year thereafter.

For the purposes of calculating plaintiff's percentage share of the profits, defendants maintain that the term "net profits" refers to profits *after* taxes owed by defendant company have been deducted, and the plaintiff contends that "net profits" means *before* taxes owed by defendant company have been deducted. The difference between the two formulas, of course, is that under the calculation defendants urge, plaintiff would receive a smaller percentage share of the profits.

In support of his interpretation, plaintiff notes that for nine years, from 1969 to 1977, plaintiff's percentage share of the business was calculated without subtracting income taxes.[3] According to the deposition of defendant company's certified public accountant, Morris Hariton, and of defendant William Norwitz, these calculations were made by M. B. Hariton & Company and approved by defendants. No income taxes could be deducted for the years 1969 and 1970 because defendant company was then a partnership, which is not a taxable entity for purposes of income taxes. However, in June, 1971 William and Martin Norwitz incorporated the company.[4] Despite the fact that a corporation is now and since 1971 has been a taxable entity for purposes of income taxes, the defendant company continued its practice of not deducting income taxes payable by the corporation from profits when calculating plaintiff's percentage share of profits.

Based on the calculation made by CPA Hariton, for the year 1978 defendant company had "net profits" of $156,006.36, entitling plaintiff to a percentage share, at 33 and ⅓ percent, of $52,002.12. Clause 3 provides that payment of the plaintiff's percentage share is to be made 30 days after the annual audit. According to plaintiff's affidavit of May 27, 1980, plaintiff's share of profits for a calendar year were paid in March or April of the following year. According to plaintiff's affidavit of June 27, 1980 defendant William Norwitz on, February 22, 1979, gave him a revised employment contract and asked him to sign it. The new employment contract[5] would have altered the formula for calculation of plaintiff's percentage share of the profits by providing that the term "net profits" was to mean profits after deduction of certain corporate expenses and after the deduction of all federal, state and local income taxes payable by the corporation.[6] The new con-

---

3. Defendants allege they will prove at trial that although they did not deduct income taxes owed by the company in calculating plaintiff's percentage share of profits, they did consistently deduct all other taxes owed by the company for purposes of the calculation, and that "[n]o justification exists for differentiating between corporate income tax and any other type of tax, as plaintiff would ask the court to do." Opposition of Defendants William Norwitz Co., Inc. to Plaintiff's Motion for Summary Judgment as to Count I of Complaint, at 5.

4. No one disputes that the successor company, William Norwitz Co., Inc., assumed the obligations of plaintiff's employment contract.

5. Exhibit C to plaintiff's complaint.

6. The provision reads in pertinent part:

 3. *Additional Compensation.*

 A. In addition to the compensation referred to in paragraph 2 hereof, for each calendar year of the Corporation during the term hereof, the Executive shall receive a thirty-three and one-third percent (33⅓%) share of the net profits of the Corporation for such calendar year. Such additional compensation shall be payable thirty (30) days after the annual audit of the Corporation's books for such calendar year.

 B. For purposes of § 3A hereof, the "net profits of the Corporation" shall, for each calendar year of the Corporation, be determined as follows: The taxable net income of the Corporation (before any adjustment for income taxes, but after adjustment for all

tract, presented for plaintiff's signature in February, 1979, was to be effective prospectively for the 11 year balance of plaintiff's employment term, and retrospectively for the year 1978.

According to plaintiff's June 27, 1980 affidavit, he called Morris Hariton, defendant's accountant, to determine the effect of this alteration and was told that for calendar year 1978 it meant that instead of receiving a percentage profit share of approximately $52,000, he would receive approximately $26,000 under the new contract. Plaintiff's affidavit further states that when he told defendant William Norwitz on March 1, 1979 that he had not made a decision whether or not to sign the new contract, he was fired. On March 6, 1980 defendants gave plaintiff a check for $3,689.50, representing $5,000 severance pay pursuant to Clause 3 of the employment contract, less withholding and FICA taxes.

On June 1, 1979 plaintiff Kass began working for Universal Bindery, Inc. (Universal), a bindery located in Tuxedo, Maryland.

Invoking this court's jurisdiction under 28 U.S.C. § 1332(a), diversity of citizenship, plaintiff on November 14, 1979 filed the present complaint consisting of five counts against defendant William Norwitz and William Norwitz Company, Inc. Count I alleges defendants have wrongfully withheld payment of plaintiff's percentage share of profits for calendar year 1978, and seeks $52,002.12 plus interest, costs and attorney's fees. Count II alleges breach of contract resulting in plaintiff losing salary, additional compensation, and other benefits

under the contract until December 31, 1989, and seeks $815,730, plus interest, costs, and attorney's fees. Count III alleges defendants have wrongfully withheld plaintiff's percentage share of profits earned as a result of his employment in January and February, 1979, and seeks $8,667.02 in estimated profits. Count IV alleges tortious wrongful discharge and seeks compensatory and punitive damages. Count V alleges defendant William Norwitz wrongfully interferred with plaintiff's contractual relationship with defendant corporation, and seeks compensatory and punitive damages.

Defendants responded on December 11, 1979 with a counterclaim [7] against plaintiff for breach of contract, alleging that plaintiff sought and accepted employment with Universal Bindery, Inc. in violation of Clause 5 of the employment contract, which restricts plaintiff's employment with a competitor while the contract is in effect and for three years afterward. Defendants also allege that plaintiff has wrongfully solicited the customers and clients of defendant Norwitz Company to transfer their business to Universal and has wrongfully diverted the business of defendants' customers and clients to Universal.

Defendants also counterclaimed against plaintiff for $80,000 allegedly overpaid plaintiff because the percentage share of profits paid to plaintiff each year since 1971 was based on a calculation in which income taxes payable by the corporation were not deducted from profits to arrive at "net profits," as defendants allege should have been done under a proper reading of the employment contract.

---

other taxes) shall be increased by the amount, if any, by which the compensation paid by the Corporation (to the extent deducted by the Corporation in determining its net income) in such calendar year to William Norwitz and/or Martin Norwitz exceeds, in the aggregate, Seventy Thousand Dollars ($70,000.00). Such adjusted taxable net income shall then be reduced by all Federal, state and local income taxes payable by the Corporation thereon for such calendar year of the Corporation in order to determine the net profits of the Corporation for such calendar year.

7. Defendants also joined Universal as an additional defendant in the counterclaim, pursuant to Rule 13(h), Fed.R.Civ.P., alleging tortious interference with contract and unfair competition. More specifically, defendants allege that Universal recruited and hired plaintiff with knowledge of the non-competition clause in plaintiff's employment contract, and with knowledge that such employment would violate the non-competition clause, and that Universal engaged in this conduct to unfairly compete with defendants. On June 26, 1980, defendants dismissed as to this defendant.

To round out this action, plaintiff has filed a counterclaim against defendants. The first count of the counterclaim alleges that defendants have failed to conduct an annual audit for the years 1971 through 1978, as required by Clause 3 of the contract in order to determine the "net profits" for purposes of calculating plaintiff's percentage share. Plaintiff thus seeks an audit for the years 1971 through 1978, to be conducted at defendants' expense.[8] Count II of the counterclaim seeks compensatory and punitive damages for defendants allegedly tortious interference with plaintiff's business relationship with Universal by bringing suit against Universal with the intent to jeopardize plaintiff's present employment.

This action is now before us on cross-motions for summary judgment. Plaintiff has moved for summary judgment on Count I of the complaint ("net profits" for 1978) and for partial summary judgment on Count II (breach of contract for a definite term). Defendants have moved for summary judgment on Counts II, IV and V of the complaint and Count II of plaintiff's counterclaim.

## II. *Analysis*

█ We are presented with questions requiring us to interpret a contract. In doing so, the parties assume, and we agree,[9] that we are bound by the law of the District of Columbia in this diversity action. It is appropriate to first discuss in some detail the legal standards we must apply to the facts before us.

█ The construction of unambiguous contractual provisions is a matter of law to be determined by the court rather than by the jury. *Clayman v. Goodman Properties, Inc., supra; Battista v. Horton, Myers & Raymond,* 128 F.2d 29 (D.C.Cir.1942); *McReynolds v. Mortgage & Acceptance Corp.,* 13 F.2d 313 (D.C.Cir.1926); *Turner v. Mertz,* 3 F.2d 348 (D.C.Cir.1925); *Cowal v. Hopkins,* 229 A.2d 452 (D.C.App.1967); *Rich v. Sills,* 130 A.2d 920 (D.C.Mun.App.1957); *Arsenault v. Angle,* 43 A.2d 709 (D.C.Mun.App.1945). Resort to extrinsic evidence, and its assessment by a jury depends upon the existence of an ambiguity in the contract. *Clayman v. Goodman Properties, Inc., supra; Vakas v. Manuel,* 316 F.2d 369 (D.C.Cir.1963); *H. Herfurth, Jr., Inc. v. United States,* 85 F.2d 719 (D.C.Cir.1936); *International Brotherhood of Painters and Allied Trades v. Hartford Accident and Indemnity Co.,* 388 A.2d 36 (D.C.App.1978); *1901 Wyoming Avenue Cooperative Association v. Lee,* 345 A.2d 456 (D.C.App.1975). Whether or not a contract or its provisions is ambiguous is a question of law first to be determined by the court. *Clayman v. Goodman Properties, Inc., supra; Dixon v. Wilson,* 192 A.2d 289 (D.C.App.1963); *Friedman v. Thomas J. Fisher & Co.,* 88 A.2d 321 (D.C.Mun.App.1952). A contract is not ambiguous merely because the parties to a contract later disagree on its meaning. *Clayman v. Goodman Properties, Inc., supra; Burbridge v. Howard University,* 305 A.2d 245 (D.C.App.1973); *Dixon v. Wilson, supra; Friedman v. Thomas J. Fisher & Co., supra.*

█ Under the law of the District of Columbia, a contract is ambiguous when it is reasonably susceptible of different constructions or interpretations, or of two or

---

8. On June 9, 1980, this court ordered an audit, by an independent accountant, of defendant company for the years 1971 through 1979. Under the terms of our order, this audit may focus on the following areas to determine whether defendants paid improper expenses: payments made to, by or on behalf of defendant William Norwitz and Martin Norwitz or members of their family; the annual amount of all employee benefits paid by the corporation on behalf of William Norwitz and Martin Norwitz; the income taxes the corporation paid from 1971 through 1979.

9. The contract, drafted and executed in the District of Columbia by a District of Columbia partnership with its principal place of business in the District, governs employment to be performed in the District of Columbia, and the actions allegedly in breach of the contract occurred in the District. Defendant Norwitz is a resident of the District of Columbia. *See Clayman v. Goodman Properties, Inc.,* 518 F.2d 1026, 1030, n. 22 (1974).

more different meanings. As the District of Columbia Court of Appeals has said:

> [A] contract is ambiguous when, and only when, it is, or the provisions in controversy are, reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings, and it is not ambiguous where the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends
> . . . .

*Burbridge v. Howard University, supra,* at 247, quoting 17A C.J.S. Contracts § 294 at 34–35 (1963). *See also 1901 Wyoming Avenue Cooperative Association v. Lee, supra; Lee v. Flintkote Co.,* 593 F.2d 1275 (D.C.Cir. 1979). An ambiguity in a contract raises a genuine issue of material fact, precluding summary judgment. *1901 Wyoming Avenue Cooperative Association v. Lee, supra,* at 461.

▮ To determine whether the provisions at issue in the instant action are ambiguous, the parties have urged on us several of the rules of construction courts normally use in such circumstances. For example, in determining whether an ambiguity exists, courts usually read the contract as a whole, interpreting all parts of the contract together.[10] Where there is an inconsistency between a general provision and a specific provision, the latter will normally qualify the former,[11] and an interpretation is preferred which gives all provisions a reasonable, lawful and/or effective meaning.[12] Other rules of construction include the rule that the conduct of the parties pursuant to a disputed provision of an agreement can be taken by the court to indicate the proper interpretation of that provision,[13] and the rule that a contract is

to be construed most strongly against its drafter.[14] Our analysis of District of Columbia case law, however, leads us to conclude that we are unable to apply these rules of construction to reach the conclusion that the contract at issue is unambiguous.

In *1901 Wyoming Avenue Cooperative Association v. Lee, supra,* the District of Columbia Court of Appeals held that a contract provision stating that a member of an apartment cooperative "shall be responsible for all interior repairs" was ambiguous on its face, requiring reversal of the lower court's grant of partial summary judgment. In doing so, the court said:

> Appellant asserts that the contract here at issue was ambiguous on its face and we agree. The meaning of the word 'interior' as used in the contract was clearly open to several reasonable interpretations. A genuine issue of material fact was thus presented and the grant of summary judgment was improper.

*Id.* at 461.

In determining whether the contract was ambiguous "on its face" the court did not specifically indicate whether it considered any of the traditional rules of construction. However, after determining that the contract was ambiguous on its face and thus not subject to summary judgment, the court went on to discuss the use of rules of construction by the lower court judge. This discussion was framed in terms of what are the proper rules to apply when "the court is faced with an integrated agreement which contains ambiguous terms. . . ." *Id.* Although not free from doubt, this discussion, in conjunction with the above quoted paragraph, leads us to conclude that the court was saying that rules of construction are employed to interpret an admittedly ambiguous contract (and not to determine wheth-

---

**10.** *1901 Wyoming Avenue Cooperative Association v. Lee, supra,* at 463, n. 17; Restatement of Contracts, § 235(c) (1932).

**11.** *1901 Wyoming Avenue Cooperative Association v. Lee, supra,* at 463, n. 17; Restatement, supra § 236(c).

**12.** Restatement, supra, § 236(a).

**13.** *Green v. Obergfell,* 121 F.2d 46 (D.C.Cir. 1941); *Svestka v. Pell,* 224 A.2d 478 (D.C.App. 1966); *Klein v. Miles, et al.,* 35 A.2d 243 (D.C. Mun.App.1944). Restatement, *supra,* § 235(e).

**14.** Restatement, *supra,* § 236(d); *see 1901 Wyoming Avenue Cooperative Association v. Lee, supra; Cowal v. Hopkins, supra.*

er a contract is ambiguous), and that an admittedly ambiguous contract may not be interpreted on a motion for summary judgment.

Our reading of this case is confirmed by a subsequent District of Columbia Court of Appeals decision, *International Brotherhood of Painters and Allied Trades v. Hartford Accident and Indemnity Co., supra.* In that case, the court framed one of the issues for decision as whether, and to what extent, a clause which was omitted from a written contract but which both parties agreed was a part of the contract, modified or superseded "other" arguably inconsistent contractual provisions. In determining whether the omitted clause and other contractual provision, when considered together, resulted in an ambiguity, the court found, after giving to the phrase in question "the plain meaning which common speech imports," that the phrase was reasonably susceptible of different constructions, and thus ambiguous. The court then said that "the trier of the fact must resolve the dispute as to what the parties meant by the guarantee clause, with reference both to extrinsic evidence and to the various rules of contract interpretation and construction...." *Id.* at 44. In a footnote, the court then listed many of the rules of construction we have discussed above.

 Reading these cases together, it appears to us .that the legal standard in the District of Columbia is that the court may determine whether or not a contract is ambiguous, and if not ambiguous, the court makes this determination of non-ambiguity *on summary judgment* by looking at the contract language and giving to that language its plain meaning according to common speech, without employing the ordinary rules of construction which are summarized in Restatement of Contracts, §§ 235 and 236 (1932). If, on the other hand, the court determines that the contract or one of its provisions is susceptible of different constructions or interpretations, or of two or more different meanings, an ambiguity exists, raising a genuine issue of material fact which precludes summary judgment.

We must apply this legal standard to the instant facts, in order to determine whether summary judgment may be granted on any issues before us.

1. *Count I of Plaintiff's Complaint*

Count I of plaintiff's complaint seeks payment of $52,002.12, which plaintiff alleges is his share of the percentage compensation for 1978, which has been withheld by defendants. This figure represents 33 and ⅓ percent [15] of the "net profits" of defendant corporation for the year 1978, as calculated by defendant's certified public accountant in accordance with the formula consistently applied since 1969. Count I thus places in issue the meaning of the phrase "net profits" as used in Clause 3 of the employment contract. As the foregoing discussion indicates, plaintiff argues that this term means profits calculated before deduction of income taxes, and that defendants have adopted this meaning in calculating plaintiff's percentage share since 1969. Defendants contend that after defendant company incorporated in 1971 and became subject to payment of income taxes, the term "net profits" for purposes of calculating plaintiff's percentage share actually meant profits after deduction of taxes payable by the corporation.

 Before we can say, as a matter of law, what the legal effect of this contractual provision is, we must first determine that the language in dispute is free of ambiguity. In doing so, we apply the legal standard applicable in the District of Columbia, which requires us to make a determination on the face of the language itself, giving that language its plain meaning, without reference to any rules of construction.[16] When viewed in this light, it is clear

---

**15.** Clause 3 of plaintiff's employment contract provides that plaintiff is to receive 33⅓ percent of the "net profits" for calendar years after 1973.

**16.** Were we to apply rules of construction, one applicable rule would be that "[i]f the conduct of the parties subsequent to a manifestation of intention indicates that all the parties place a

to us that the term "net profits" is susceptible of at least two interpretations. It could refer to profits before or after taxes are deducted. That being so, we must find that this ambiguity precludes summary judgment on this issue.

### 2. *Count II of Plaintiff's Complaint*

In Count II of his complaint, plaintiff alleges that defendants breached his 20 year employment contract by discharging him prior to the expiration of that term. He accordingly seeks his annual salary, percentage share of the profits, and other benefits for the remaining life of the contract. Plaintiff has moved for summary judgment on this count solely on the issue of liability. Defendants oppose plaintiff's motion for summary judgment on this issue and themselves move for summary judgment on Count II, in essence arguing that Clause 3 of the employment contract gave defendants the right to discharge plaintiff at any time for any reason upon payment of $5,000 severance pay, and that this provision was all the compensation plaintiff was entitled to if he was discharged. Clause 3 reads in pertinent part: "In the event that the Company shall deem that the Executive be disassociated, he shall receive Five Thousand Dollars ($5,000.00) as severance pay, in lieu of any further compensation." Defendants argue that this provision allows them to terminate plaintiff at will, but that even were "just cause" necessary for dismissal, defendants are the sole judge of what is just cause, and such cause in fact existed.

We are faced with reading the contract provision giving plaintiff an employment term of twenty years, and the above quoted "disassociation" provision to determine whether the contract is ambiguous on this issue, and if not ambiguous, whether we can interpret the contract as a matter of law. We conclude that the narrow analysis required by the District of Columbia courts results in our finding that the contract is ambiguous on this issue, preventing us from determining whether a breach occurred.

Giving to these provisions the plain meaning accorded by common speech, we find that these provisions read together, without application of any rules of construction, are subject to more than one reasonable interpretation. For example, the language may be read to provide plaintiff with employment for twenty years, subject only to "disassociation" for just cause, upon payment of $5,000 severance pay. These provisions may also be read to provide that plaintiff is to be employed for twenty years, unless defendants decide for any reason that he be disassociated upon payment of $5,000 severance pay. We accordingly deny summary judgment on this issue.

### 3. *Count IV of Plaintiff's Complaint*

Count IV of plaintiff's complaint alleges that defendants tortiously and wrongfully discharged plaintiff. Because resolution of this issue necessarily involves an interpretation of the "disassociation" provision of Clause 3, which we have determined we cannot decide on defendants' motion for summary judgment, we also find that we cannot decide this issue on defendant's motion for summary judgment.

### 4. *Count V of Plaintiff's Complaint*

Count V of plaintiff's complaint alleges tortious interference with contractual relationship against defendant William Norwitz individually and the defendant company. Defendants have moved for summary judgment on this issue, arguing that a party to a contract (the corporation) cannot be sued for inducing the violation of that contract, and that this principle also bars a suit against defendant Norwitz individually if he acted in his official capacity. This issue has not been thoroughly briefed by the parties, and defendants have cited no precedent in the District of Columbia. Because this case must in any event go to trial, we believe it appropriate to exercise our discretion not to decide the legal issue presented here until there has been a fuller presentation of facts and a more thorough briefing of the issue.

particular interpretation upon it, that meaning is adopted if a reasonable person could attach

it to the manifestation." Restatement, *supra*, § 235(e).

### 5. *Count II of Plaintiff's Counterclaim*

Count II of plaintiff's counterclaim against defendants seeks compensatory and punitive damages for defendants filing what plaintiff alleges was a frivolous counterclaim against Universal Bindery[17] brought solely for the purpose of harming plaintiff by interfering with his business relationship with Universal, his new employer. Defendants have moved for summary judgment on this issue, arguing that the filing of a legal action is absolutely privileged and thus does not give rise to liability for interference with business relationships. Defendants have cited no authority in the District of Columbia for their argument of absolute privilege. Because the overall conduct of defendants may well be directly relevant to any defense of absolute privilege, and because this is a factual issue in dispute, we now decline to enter summary judgment on this issue.[18]

Given that this case must now proceed to trial, we find it appropriate to note the proper procedure at trial under District of Columbia law for determining the legal consequences of the disputed contract provisions. We quote from the District of Columbia Court of Appeals decision in *1901 Wyoming Avenue Cooperative Association v. Lee, supra,* n. 8, at 461.

> Appellee had requested a jury trial, so that the function of interpreting the contract, if the evidence adduced at trial supported diverse reasonable results, would fall to the jury. . . .
>
> If the evidence did not support several reasonable interpretations, but instead only one, the meaning of the contract would be decided by the court as a matter of law. The Restatement of the Law Second, Contracts 2d, Tentative Drafts

Nos. 1–7 (1973) states that '[a] question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence. Otherwise a question of interpretation of an integrated agreement is to be determined as a question of law.'

As we have indicated above, at trial the court will be free to apply the rules of construction normally applied by the courts in contract interpretation cases in the District of Columbia, and the court will decide, after doing so, whether any ambiguities exist.

An order consistent with the foregoing has been entered this day.

---

17. As previously stated, this matter has since been voluntarily dismissed by defendants.

18. Defendants have filed a motion to dismiss and/or strike plaintiff's counterclaim. To the extent defendants' motion is based on failure to state a claim upon which relief can be granted because defendants filing of a lawsuit is absolutely privileged, we deny the motion for the reasons stated here. To the extent plaintiff's motion is based on the argument that plaintiff should really have sought leave of court to amend his complaint because Rule 13 Fed.R. Civ.P. does not allow a plaintiff to file a counterclaim against a party who is already a defendant in the same action, we find that the liberal construction to be accorded Rule 13, which speaks in terms of "parties" and "pleadings", allows a plaintiff to file a counterclaim against a counterclaiming defendant. *See* 3 Moore's Federal Practice, ¶ 13.08 (2d ed. 1979).