723 F.2d 1298
 ATCHISON, TOPEKA, AND SANTA FE RAILWAY COMPANY, Burlington
Northern Inc., Chesapeake and Ohio Railway Company,
Baltimore and Ohio Railroad Company, and Union Pacific
Railroad Company, Plaintiffs-Appellants,
v.
NATIONAL RAILROAD PASSENGER CORPORATION, Defendant-Appellee,
and
The United States of America, Intervenor-Appellee.
 No. 82-3057.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 12, 1983.
Decided Dec. 13, 1983.
 
 1
 George A. Platz, Sidley & Austin, Chicago, Ill., for plaintiffs-appellants.
 
 
 2
 Paul F. Mickey, Jr., Washington, D.C., for defendant-appellee.
 
 
 3
 Thomas H. Peebles, Civil Div., Dept. of Justice, Washington, D.C., for intervenor-appellee.
 
 
 4
 Before PELL and COFFEY, Circuit Judges, and NEAHER, Senior District Judge.*
 
 
 5
 NEAHER, Senior District Judge.
 
 
 6
 Plaintiffs, Atchison, Topeka, and Santa Fe Railway Company, Burlington Northern Inc., Chesapeake & Ohio Railway Company, Baltimore and Ohio Railroad Company, and the Union Pacific Railroad Company (railroads), appeal the District Court's entry of summary judgment in favor of defendant National Railroad Passenger Corporation (Amtrak). Because the suit challenged the constitutionality of a statute, the United States intervened below and submitted a brief on appeal. We affirm the District Court's judgment in part and reverse it in part.
 
 I.
 
 7
 In 1971, when Congress created Amtrak (the Rail Passenger Service Act, 45 U.S.C. Sec. 501 et seq.), it did not explicitly decide who should pay for the time-honored custom (dating back to the 1880's) of providing railroad employees with free passes. That deficiency and its subsequent definitive solution have generated this controversy.
 
 
 8
 Pursuant to 45 U.S.C. Sec. 561,[1] Amtrak negotiated a "Basic Agreement" with each plaintiff containing the following relevant language:
 
 
 9
 "Section 2.1 Relief from Responsibility
 
 
 10
 "From and after May 1, 1971, Railroad shall be relieved of its entire responsibility for the provision of Intercity Rail Passenger Service.
 
 
 11
 * * *
 
 
 12
 * * *
 
 
 13
 "Section 7.5 Transportation Privileges
 
 
 14
 "Transportation privileges, if any, with respect to business and personal travel of Railroad personnel shall be as determined by [Amtrak]."
 
 
 15
 When Amtrak assumed the railroads' intercity passenger operations, it initially decided to reduce employee pass privileges. An ongoing dispute arose, and Congress eventually settled the issue with Public Law 92-316, 45 U.S.C. Sec. 565(f), which expressly restored employees' pass privileges on terms similar to those available on April 30, 1971. The statute also required the railroads to reimburse Amtrak for costs incurred in furnishing the passes.
 
 
 16
 After hearing evidence, the Interstate Commerce Commission set the rate of reimbursement at .00079 cents per passenger mile. The I.C.C. also found that these costs should be offset by the sums collected from employees paying half fare. As it turned out, the revenues from the half fares exceeded the variable costs and, consequently, Amtrak collected only administrative expenses amounting to about $500,000 per year from 1972 to 1979.
 
 
 17
 In 1979 Congress enacted the Amtrak Reorganization Act, Public Law 96-73, 95 Stat. 547, which amended section 565(f). Beginning October 1, 1979 and for two years thereafter, Amtrak was to be reimbursed "at the rate of 25 percent of system wide average monthly yield per revenue passenger mile." Amtrak billed the railroads at rates from .02067 cents to .02343 cents per passenger mile.[2] The two-year limitation upon the new method of computing costs was subsequently eliminated. Public Law 97-35, 95 Stat. 697.
 
 II.
 
 18
 At the outset, the railroads present three theories by which they urge the Court to find that they possess vested contractual rights against the United States. Having established this contract, they make two contentions: Both the original (1972) version of section 565(f) and the 1979 amendment impair those rights in a constitutionally impermissible manner.
 
 
 19
 Amtrak, which was authorized to negotiate the basic agreement and was the only defendant sued, is not an agency or establishment of the United States. 45 U.S.C. Sec. 541. Nevertheless, we need not consider the source of the railroads' asserted rights because the terms of the basic agreement, while somewhat more specific, parallel the statute which authorized them. Thus, the railroads have no more contractual rights under the terms of the statute than they have under the terms of the basic agreement. Further, whatever the source of the railroads' rights, we conclude first, that Congress did not act unconstitutionally in requiring the railroads to reimburse Amtrak for employee pass privileges, but second, that the method chosen for reimbursement in the 1979 amendment does impermissibly impair the terms of the basic agreement. We turn first to the railroads' claim that reimbursement impairs their rights.
 
 III.
 
 20
 The railroads read sections 2.1 and 7.5 (quoted above) of the basic agreement together to contend that they have been relieved of any financial responsibility for employee pass privileges. We do not agree.
 
 
 21
 The parties disagree over the meaning to be accorded the language of section 2.1 of the basic agreement.[3] As such, the Court is required to interpret a contract governed by the law of the District of Columbia. 45 U.S.C. Sec. 546(d). The applicable rules in the District of Columbia are as follows:
 
 
 22
 " 'As we turn to the authorities, we may note that the theory of "objective law" of contracts has been almost universally adopted by this time. The written language embodying the terms of an agreement will govern the rights of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless there is fraud, duress or mutual mistake.' " Minmar Buildings, Inc. v. Beltway Excavators, Inc., 246 A.2d 784, 786 (D.C.App.1968) (citations omitted).
 
 
 23
 "Whether or not a contract or its provisions is ambiguous is a question of law first to be determined by the court. A contract is not ambiguous merely because the parties to a contract later disagree on its meaning.
 
 
 24
 "Under the law of the District of Columbia, a contract is ambiguous when it is reasonably susceptible of different constructions or interpretations, or of two or more different meanings. As the District of Columbia Court of Appeals has said:
 
 
 25
 '[A] contract is ambiguous when, and only when, it is, or the provisions in controversy are, reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings, and it is not ambiguous where the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends....' "
 
 
 26
 Kass v. William Norwitz Co., 509 F.Supp. 618, 623-24 (D.C.1980) (citations omitted).
 
 
 27
 We find no ambiguity in section 2.1 of the basic agreement. In its order, the District Court correctly concluded that the provision of employee pass privileges was never a "responsibility" of the railroads in providing intercity passenger service.[4] It was a totally gratuitous undertaking which never became part of any contract or collective bargaining agreement. The creating statute specifically required a railroad to make arrangements as necessary to preserve "rights, privileges, and benefits ... under existing collective bargaining agreements or otherwise." 45 U.S.C. Sec. 565(b). Moreover, if the railroads had ever terminated the program, their employees would have had no legal recourse.[5]
 
 
 28
 At the inception, when Amtrak proposed a reduction in pass privileges, railroad employees threatened to strike, Congress appeased them with the enactment of 45 U.S.C. Sec. 565(f), and the railroads operated for seven years apparently content to pay the administrative costs of the pass privilege program. The railroads were motivated into litigation in December 1980 only after Congress had adopted a method of reimbursement based upon the value of the service furnished. As we explain below, this method impairs rights created by the basic agreement.
 
 IV.
 
 29
 In approaching the railroads' arguments concerning the 1979 method of reimbursement, the government ignores the effect of the language of the basic agreement. The government argues that Congress chose a rational method of spreading the costs, Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 19, 96 S.Ct. 2882, 2894, 49 L.Ed.2d 752 (1976), and therefore, the railroads ask this Court to reweigh the evidence and substitute its judgment for that of Congress contrary to the admonition of Kleppe v. New Mexico, 426 U.S. 529, 541 n. 10, 96 S.Ct. 2285, 2292 n. 10, 49 L.Ed.2d 34 (1976). Congress was not legislating on a clean slate, however.
 
 
 30
 Each side posits its own motivations for Congress' action derived from the legislative history. We need not engage in speculation about motives, although it would be reasonable to conclude from the record that the financial debacle of Amtrak's first eight years contributed to the new method of cost spreading. We also need not weigh evidence nor determine the legislative power of Congress. The issue is whether Amtrak may bill the railroads at the statutorily authorized rate in light of the basic agreement and not whether the statute itself is valid.
 
 
 31
 Amtrak was created to "provide intercity passenger rail service." 45 U.S.C. Sec. 541. Congress specifically found the need for such service and the need for federal intervention to provide it. 45 U.S.C. Sec. 501. Congress also bestowed power and authority on Amtrak to enable it to accomplish the intended legislative end. 45 U.S.C. Sec. 545. As a consequence, any revenue Amtrak collects, unless earmarked for a specific purpose, is available to finance intercity rail passenger service, the provision of which, under the basic agreement, is no longer the railroads' responsibility.
 
 
 32
 Although we have found that employee pass privileges were not a responsibility of the railroads, the statute at issue authorizes reimbursement beyond the costs of the passes. It thereby transfers funds from the railroads to Amtrak, which funds Amtrak may in turn use to finance aspects of its operations that were once part of the railroads' entire responsibility for the provision of intercity rail passenger service. We have no facts or evidence before us to demonstrate that the statute operates in any different manner than to attempt to take back part of what Congress authorized Amtrak to give in the basic agreement. Thus, the railroads have established the impairment of the contract, or more specifically, that the statute authorizes Amtrak to breach the basic agreement.[6]
 
 
 33
 To avoid being in breach, Amtrak would ordinarily have to furnish additional consideration for its modification of the basic agreement, Nyhus v. Travel Management Corp., 466 F.2d 440, 445-46 (D.C.Cir.1972); City Stores Co. v. Ammerman, 266 F.Supp. 766, 772 (D.C.1967), aff'd, 394 F.2d 950 (D.C.Cir.1968) (per curiam ); however, because Congress authorized the modification, we must examine the record to determine if, under the circumstances, Congress acted pursuant to "the federal police power or some other paramount power." Lynch v. United States, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934) (emphasis added).[7]
 
 
 34
 Without labeling it a "paramount power", the government argues that Congress acted reasonably pursuant to its commerce power. We have no doubt that the 1979 amendment may be sustained as a legitimate exercise of the commerce power. Ending the inquiry there, however, would render any legislative enactment which impaired a contract virtually immune from judicial review, a result not intended by Lynch, see 292 U.S. at 579-80, 54 S.Ct. at 843-44. It would also ignore Amtrak's burden to establish that, under the circumstances of this case, Congress' regulation of interstate commerce in this specific statute is, by virtue of the evidence before it or the courts, paramount to the rights of the railroads under the basic agreement. See Nachman Corp. v. Pension Benefit Guaranty Corp., 592 F.2d 947, 958-63 (7th Cir.1979), aff'd, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980).
 
 
 35
 Measured by the standards of Nachman Corp., 592 F.2d at 960, neither Amtrak nor the government have met this burden. They provide no rationale, beyond a claim of reasonableness, why Amtrak should realize a windfall, an amount in excess of what the railroads would have expended had they provided the pass privileges.
 
 
 36
 Moreover, the new scheme irrationally eliminates the offset for half fares. Despite Amtrak's claim that costs are difficult to determine separately, it can easily determine the amount of half fares it collects from passholders and apply that against the amount due from a railroad.
 
 
 37
 Under the 1972 scheme the half fares paid the way of the free fares. Undoubtedly this occurred because the pass privilege is afforded on a space available basis. Thus, passholders occupy seats that would otherwise be empty. There is no evidence that Amtrak operates scheduled passenger trains contingent on the adequate sale of tickets. Therefore, Amtrak incurs certain costs, otherwise partially allocable to the pass privileges program, regardless of whether it issues any passes. Because the eligibility for passes was frozen as of April 30, 1971, those costs will increase in the future as the number of passholders decreases until there are no more passholders. The 1979 amendment makes no provision for these events. Neither Amtrak nor the government has explained the reasonableness of the 1979 amendment as a regulation of commerce in light of these facts. As a result, we conclude that the 1979 amendment to 45 U.S.C. Sec. 565(f) unreasonably and illegally impairs the rights of the railroads under the basic agreement and may not be enforced. Accordingly, the District Court's judgment upon this issue is reversed.
 
 
 38
 Affirmed in part; reversed in part.
 
 
 
 *
 The Honorable Edward R. Neaher, Senior District Judge for the Eastern District of New York, is sitting by designation
 
 
 [1]
 Sec. 561(a) provides in relevant part:
 "(1) On or before May 1, 1971, the Corporation [Amtrak] is authorized to contract and, upon written request therefor from a railroad, shall tender a contract to relieve the railroad, from and after May 1, 1971, of its entire responsibility for the provision of intercity rail passenger service."
 
 
 [2]
 Plaintiffs represent that they paid the following additional sums respectively: Santa Fe, $336,249.82; Burlington Northern, $490,344.72; Chesapeake & Ohio and Baltimore & Ohio, $76,345.34; and Union Pacific, $287,784.66. The sums represent the first ten months of operation of the 1979 amendment
 
 
 [3]
 Plaintiffs also find significance in section 7.5, which merely gives Amtrak the right to determine the extent of employee pass privileges. Its practical viability is somewhat lessened by Congress' subsequent intervention in 45 U.S.C. Sec. 565(f), which established the extent of employee pass privileges as a matter of public policy. Section 7.5 of the basic agreement also contains no language addressing who pays for the costs of the pass privileges
 
 
 [4]
 The railroads reason that pass privileges fall within the broad definition of "Intercity rail passenger service", 45 U.S.C. Sec. 502(5), and that they have been relieved of their entire responsibility for the provision thereof; therefore, they assert they have no liability for the costs of passes
 This argument goes far beyond the context of the basic agreement and the statute. Despite the rather broad language employed in the basic agreement, as derived from 45 U.S.C. Sec. 561, other portions of the statute and basic agreement impose obligations of a financial or potentially financial nature at least as directly related to the provision of intercity passenger rail service as employee passes. 45 U.S.C. Sec. 562; 45 U.S.C. Sec. 565; Basic Agreement, Sec. 7.5, clauses 1 through 4. Consequently, the release from financial responsibility is not all encompassing and in any event, would only cover those items falling within the ambit of its language.
 Additionally, the contractual language at issue, born of 45 U.S.C. Sec. 561(a)(1), is inextricably interwoven in the statute with the decision of the Interstate Commerce Commission on the amount of the contracting railroad's "avoidable loss", defined in 45 U.S.C. Sec. 502(6). This context compels a very narrow reading of the term "responsibility", one which confines its meaning to the obligations imposed by virtue of statutes and regulations. See generally Seaboard Coastline R. Co. v. Nat. R.R. Pass. Corp., 645 F.2d 513, 516 (5th Cir.1981).
 Relying on Penn Central Transp. Co. Discontinuance of Trains, etc., 334 I.C.C. 312, 331-32 (1969), and Union Pac. R. Co. Discontinuance of Trains, etc., 334 I.C.C. 50, 53 n. 1, the railroads argue that pass privileges were one of their responsibilities of which they were relieved; however, as is apparent from the text of the cited decisions, the I.C.C. merely considers passes as one aspect of ridership, which is in turn one factor it considers in ruling upon a carrier's request to discontinue service.
 
 
 [5]
 The same would not be true of employees who held a collective bargaining agreement containing a pass privileges provision. See Baker v. System Federation No. 1, 331 F.Supp. 1363 (E.D.Pa.1971)
 
 
 [6]
 The size of the sums exacted, note 2 supra, under the 1979 amendment, precludes any contention that it is merely a "minimal" alteration of the basic agreement. See Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 245, 98 S.Ct. 2716, 2723, 57 L.Ed.2d 727 (1978)
 
 
 [7]
 The railroads urge us to use the assertedly more stringent standard of review of Contract Clause cases, e.g., Energy Reserves Group, Inc. v. Kansas Power & Light Co., --- U.S. ----, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) (cases cited therein); however, we need not do so in order to reach our result