See also 794 F.Supp. 434.

**BENNETT ENTERPRISES,
INC., Appellee,**

v.

**DOMINO'S PIZZA, INC., Appellant,**

**Domino's Pizza Distribution Corporation,
Inc., Appellant.**

**BENNETT ENTERPRISES,
INC., Appellant,**

v.

**DOMINO'S PIZZA, INC., Appellee,**

**Domino's Pizza Distribution Corporation,
Inc., Appellee.**

Nos. 93–7188, 93–7189.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 6, 1994.

Decided Feb. 3, 1995.

Rehearing and Suggestion for Rehearing
In Banc Denied April 7, 1995.

John F. Verhey, Chicago, IL, argued the cause for appellant/cross-appellee. With him on the briefs were Marc P. Seidler, Chicago, IL, David J. Cynamon and Ellen M. Jakovic, Washington, DC.

Michael J. McManus, Washington, DC, argued the cause for appellee/cross-appellant. With him on the brief was John A. Bonello, Washington, DC. John Joseph Brennan, III, Washington, DC, entered an appearance for appellee/cross-appellant.

Before SILBERMAN, BUCKLEY, and SENTELLE, Circuit Judges.

SENTELLE, Circuit Judge:

Domino's Pizza, Inc. ("Domino's") appeals a jury verdict awarding Bennett Enterprises, Inc. ("Bennett") $2,250,000 in compensatory and punitive damages on its claims for breach of contract and tortious interference with a prospective economic benefit, arising from Domino's' default of its franchise agreement for failure to pay taxes and the subsequent sale of its store. Because the franchise agreement was, as a matter of law, unambiguous regarding Domino's' right to place a franchisee in default for failure to adhere to the tax laws and there was no other sufficient evidence of contract breach, and because the elements of tortious interference were not made out, the judgment is hereby reversed.

## I. BACKGROUND

In December 1987, Bennett, a corporation created by Bruce and Arthur Bennett, two experienced Domino's managers, entered a franchise agreement with Domino's providing that Bennett would operate a Domino's pizza store on Hawaii Avenue in Washington, D.C. The agreement provided in section 15.2, under the heading "Operating Requirements," that Bennett "agree[d] to secure and maintain in force all required licenses, permits and certificates and operate the Store in full compliance with all applicable laws, ordinances and regulations." Section 18.2, under "Termination and Expiration," stated that Domino's had the right to terminate the franchise agreement if Bennett did certain enumerated things, such as underreporting royalty sales, or "fail[ing] to comply with any other provision of this Agreement or any specification, standard or operating procedure and [failing] to correct this failure within thirty (30) calendar days after written notice." In section 11, Domino's agreed to provide "such reasonable operating assistance as [it] determined from time to time to be necessary for the operation of the Store," including advice and guidance regarding "the establishment of administrative, bookkeeping, accounting, inventory control and general operating procedures." Section 11 further stated that this assistance did not obligate Domino's to operate the store or "to provide the accounting or bookkeeping services required for the operation of the Store." Additionally, section 18.2(j) provided that Domino's had the right to terminate the agreement if Bennett failed to "pay when due any amount owed to [Domino's] ... or any creditor or supplier of the Store (other than amounts being bona fide disputed through appropriate proceedings)" and did not remedy this failure within fifteen days after the receipt of written notice.

After opening in December 1987, the store sold many pizzas but, for various reasons, did not turn a profit. Central to the problems was Bennett's failure to control its costs, file its required profit and loss reports with Domino's, and, most importantly, pay its federal, state, and D.C. payroll, income, and sales taxes for most of 1988. At trial, Arthur Bennett stated that Bennett's first two accountants, whom Bennett chose and who were not employed by Domino's, both failed to pay any of Bennett's taxes or file the profit and loss statements. Bruce Bennett admitted that he had to write all the checks to pay bills and accounts payable and that while he paid other bills, he did not write any checks to pay taxes. Bennett had also failed to make payments to a creditor James Artis, who had loaned the Bennett brothers initial capital. Artis obtained a $66,300 judgment against Bennett in April 1989.

Bennett's first accountant, Patrick Miller, called Domino's in February 1988 to say that Bennett was having accounting and cash control problems and stated that he felt they may not have paid any taxes. Artis contacted Domino's Franchise Operations Director Patricia Harriday in July 1988 and told her that Bennett was not giving its accountants the proper information to prepare profit and loss statements and was not paying its taxes. Domino's then contacted Bennett's accountant to confirm that Bennett had not paid taxes, and arranged a July 1988 meeting with Bennett, during which Domino's told Bennett to resolve its tax problem and suggested ways it could cut costs and increase profits. Harriday testified that in September and October 1988 she had several meetings with Bennett to advise the company further and that Bennett failed to show up for several and generally showed little progress in making tax payments.

In December 1988, Domino's notified Bennett that it was placing it in default of the franchise agreement for violating section 15.2 by failing to pay taxes, and gave Bennett thirty days to cure the default. In February 1989, after the IRS said it would take six to ten weeks to get a tax payment plan set up, Domino's took Bennett out of default with the proviso that if Bennett did not have its prepayment plan set up within ten weeks, it would again be placed in default.

In November 1988, Bennett hired accountant Gordon Clay. Clay testified that, as of his hiring, Bennett had not yet paid any 1988 taxes and that, starting in late 1988 to early 1989, Bennett began to pay its current tax liabilities and to get its costs under control.

Bennett also handed over its check writing responsibilities to Clay at this time. Clay stated that Domino's contacted him in December 1988 inquiring about the status of Bennett's financial information and preparation of a tax plan to pay those liabilities. In the spring of 1989, Clay was able to work out a tax repayment plan with D.C. but had not yet worked out such a plan with Maryland or the IRS by April 1989.

In April 1989, Domino's notified Bennett that its failure to remedy its tax liabilities placed it in default of section 15.2 of the franchise agreement, and gave Bennett thirty days to either pay the taxes or demonstrate to Domino's that it had payment plans in place. Unable to resolve its tax problems, Bennett sought a buyer for the franchise, and Domino's gave it until June 1989 to do so. There were several ways in which to value the store to determine its offering price. The valuation method in section 19 of the franchise agreement, which gave Domino's the option to purchase the store, gave a value of approximately $424,000 based on sales in the previous twelve months. At trial, the parties disputed whether another formula, used for successful stores, would yield a valuation of $1.2 million or of roughly $600,000.

In May 1989, Bennett approached Meeks, another Domino's franchise owner, with an offer to sell him the store for $1.5 million, which Meeks refused. Bennett then negotiated with another owner, Duignan, who originally suggested a price of $900,000 based on Bennett's representations that its sales were $1.8 million. After finding out that his bank would not lend him $900,000 to buy the store and that Bennett's sales were actually $1.3 million, Duignan decided to withdraw his offer. Bennett then agreed to sell the store to Meeks for $500,000 but made a last minute deal with Duignan to sell for $600,000. Domino's gave Bennett an extension of the default deadline to complete negotiations and approved the sale to Duignan. At trial, Bennett offered evidence of a conversation between Domino's franchise consultant, Susan Fulton, and Meeks, after Meeks had made his $500,000 offer, in which Meeks stated that Bennett's store had operational problems and Fulton acknowledged that these problems did exist.

Three years later, Bennett sued Domino's for breach of the franchise agreement on the ground that the agreement did not entitle Domino's to declare Bennett in default on the basis of tax liabilities. Bennett asserted that section 15.2, which required compliance with all applicable laws, did not give Domino's the right to default Bennett for nonpayment of taxes. At trial, Bennett elicited testimony from Domino's officials that the term "applicable laws" would not encompass things such as parking tickets. On the basis of the franchise agreement's purported ambiguity, the district court admitted into evidence subsequent versions of Domino's' standard franchise agreement, which specified that Domino's had a right to default the franchisee for nonpayment of taxes. Bennett further argued that Domino's had an obligation under the agreement to assist it in resolving its tax problems, which Domino's failed to fulfill. Bennett also claimed that Domino's tortiously interfered with its prospective economic advantage by disseminating information about Bennett's financial situation to potential buyers, thus causing the buyers to rescind or lower their offers. As a result, Bennett claimed that it was forced to sell the store for less than its actual value.

After a three-day trial, the jury awarded Bennett $850,000 in damages on its claim that Domino's breached the franchise agreement by declaring Bennett in default and by failing to offer reasonable assistance in resolving Bennett's tax problems. The jury also found that Domino's intentionally and tortiously interfered with Bennett's prospective economic advantage and awarded $450,000 in damages. Finally, the jury gave Bennett $950,000 in punitive damages.

Domino's moved for judgment as a matter of law or a new trial on the basis that the verdict was against the weight of the evidence and that the tortious interference award was duplicative of the breach of contract damages. The district court concluded that the jury's verdict was consistent with the evidence and that recovery in tort and contract was permissible because the damages compensated Bennett for two discrete

harms. The district court also denied Bennett's motion to alter or amend the judgment, which argued that the district court erred in instructing the jury to subtract the $600,000 sale price from the breach of contract award.

## II. DISCUSSION

### A. Breach of Contract Claims

■ Domino's states that section 15.2 unambiguously authorized Domino's to default Bennett for failure to obey the tax laws since it obligated Bennett to operate its store "in full compliance with all applicable laws, ordinances and regulations." Although the tax laws were not specifically mentioned, Domino's asserts that the term "all applicable laws" must be read in its plain and ordinary meaning to encompass every law without exception.

■ District of Columbia law governs this diversity action. *Erie R.R. Co. v. Tomkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Gray v. American Express Co.*, 743 F.2d 10, 16–17 (D.C.Cir.1984) (District of Columbia law is treated as state law for purposes of the "Erie Doctrine"). Under District law, the question whether a contract provision is ambiguous is a question of law, which this court reviews *de novo*. *Harbor Ins. Co. v. Omni Constr., Inc.*, 912 F.2d 1520, 1522 (D.C.Cir.1990). A contract provision is ambiguous if it is reasonably susceptible of different constructions, *id.*, but it is not ambiguous merely because the parties later disagree on its meaning. *Clayman v. Goodman Properties, Inc.*, 518 F.2d 1026, 1034 (D.C.Cir.1973); *Kass v. William Norwitz Co.*, 509 F.Supp. 618, 623 (D.D.C.1980). The admissibility of extrinsic evidence and the possible need for a jury to assess it depend upon the existence of an ambiguity in the contract. *Clayman*, 518 F.2d at 1034; *Kass*, 509 F.Supp. at 623.

The language of section 15.2 is not ambiguous in its application in this case because it is not reasonably or fairly susceptible to an interpretation that does not encompass compliance with state and federal tax laws. That the contract may not be interpreted absolutely so as to include parking laws does not change the fact that any reasonable construction of the language "all applicable laws" in a business franchise agreement must include tax statutes at the very minimum. To that extent the contract is unambiguous, and that is the only extent with which we are concerned. Thus, the district court erroneously admitted into evidence subsequent forms of Domino's' standard franchise agreement that expressly set forth violation of the tax laws as a reason for default. Under the franchise agreement Domino's had the right to place Bennett in default for failure to pay taxes. The question then becomes whether the evidence established that Domino's breached the contract as interpreted by this court.

■ In reviewing the trial court's decision on a motion for judgment as a matter of law, we evaluate *de novo* whether the prevailing party proffered sufficient evidence upon which a jury could properly base a verdict in its favor. *Mackey v. United States*, 8 F.3d 826, 829 (D.C.Cir.1993). We, like the trial court, view the evidence in the light most favorable to the prevailing party, and the jury's verdict must stand unless the evidence, together with all inferences that can reasonably be drawn therefrom, is so one-sided that reasonable people could not disagree on the verdict. *Id.* See also *McNeal v. Hi–Lo Powered Scaffolding, Inc.*, 836 F.2d 637, 640–41 (D.C.Cir.1988); *Carter v. Duncan–Huggins, Ltd.*, 727 F.2d 1225, 1227 (D.C.Cir. 1984).

■ While, at the end of 1988, Bennett started to pay current taxes as they became due, as of April 1989, when Domino's placed it in default, Bennett admittedly still had not remedied its large outstanding tax liabilities arising from its failure to pay taxes for much of 1988, and it never negotiated payment plans with Maryland or the IRS. Thus, the evidence was undisputed that Bennett was not in compliance with the tax laws at the time of default. Because there was no countervailing evidence upon which the jury could base its conclusion that Domino's breached the contract by exercising its right to place Bennett in default for failure to adhere to the applicable tax laws, the verdict on this claim cannot stand.

■ Bennett also failed to make out a breach of contract under section 11 of the franchise agreement. The evidence is undisputed that Domino's provided Bennett more than the reasonable assistance that section 11 of the franchise agreement required. Bennett admitted that Domino's offered an accounting service to provide bookkeeping and tax services for an extra charge and that it declined to use this service and instead hired its own accountant. Also, neither Bennett nor its accountant submitted the required profit and loss statements until many months had elapsed, and thus Domino's could not verify whether the accountant's speculation that Bennett was not paying tax was true. Bennett either knew or should have known that it was not paying its tax at this time since Bruce Bennett was responsible for writing the checks to pay all bills until he turned over this responsibility to his accountant at the end of 1988. Furthermore, once Domino's confirmed that Bennett had tax problems, it reviewed Bennett's books, scheduled meetings to help Bennett handle this problem, recommended that Bennett hire a new accountant to set up a tax repayment plan, and gave Bennett several months to cure by taking it out of default after the December notice.

Under section 11 of the franchise agreement, Domino's was obligated merely to provide "such reasonable operating assistance as [it] determined from time. to time to be necessary for the operation of the Store." It specifically was not obligated to operate the store or "to provide the accounting or bookkeeping services required for the operation of the Store." The franchise ·agreement makes it explicit that Bennett was responsible for obtaining its own accounting services and paying its own taxes. The undisputed evidence established that once the tax problem was verified, Domino's provided Bennett extensive assistance, and no reasonable factfinder could draw from this evidence the inference that Domino's failed to offer Bennett the contractually required "reasonable operating assistance." Accordingly, the jury's verdict on this issue is unsupported by the evidence and must be reversed. *Cf. Mackey v. United States,* 8 F.3d at 829 (the jury's verdict must stand unless the evidence, together with all the inferences that can reasonably be drawn therefrom, is so one-sided that reasonable people could not disagree on the verdict).

## B. *Tortious Interference with Economic Advantage*

Bennett argued that Domino's tortiously interfered with its reasonable business expectancy of receiving between $900,000 and $1.5 million. The jury awarded $450,000 in damages for tortious interference, suggesting that the store could have been sold for $1,050,000 had Domino's not allegedly interfered. At trial, Bennett pressed two grounds for its tortious interference claim: 1) that Domino's wrongly placed it in default and gave it only thirty days in which to sell, thereby preventing it from maximizing the sales price for the business; and 2) that Domino's improperly gave bidders confidential information that led them to withdraw their bids or make lower offers. In light of our holding that Domino's did not wrongly place Bennett in default, however, Bennett's first ground cannot support a tortious interference claim since the default was not wrongful.

■ As to the second asserted ground, Bennett introduced testimony regarding a conversation between Domino's franchise consultant Susan Fulton and Meeks, after Meeks had made his $500,000 offer, in which Meeks stated that Bennett's store had operational problems and Fulton acknowledged that these problems did exist. It appears, however, Meeks did not need to obtain this information from Domino's since Bennett had supplied him with financial information before he made his offer, and Meeks testified that the *Bennett brothers* told him that they had a short time in which to sell. Moreover, Bennett offered no evidence of any communications between Domino's and Duignan, and Duignan specifically stated that although he made an initial offer of $900,000, it was based on Bennett's initial representation that sales were $1.8 million, and that he made a $600,-000 second offer based on the correct sales figure of approximately $1.3 million.

To establish a claim for tortious interference with economic advantage under District of Columbia law, the evidence must show:

(1) the existence of a valid business relationship or expectancy,

(2) knowledge of the relationship or expectancy on the part of the interferer,

(3) intentional interference inducing or causing a breach of termination of the relationship or expectancy, and

(4) resultant damage.

*Genetic Sys. Corp. v. Abbott Labs.*, 691 F.Supp. 407, 422–23 (D.D.C.1988); *see also Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284 (D.C.App. 1977). As its name would suggest, *intentional* interference requires an element of intent. Further, "a general intent to interfere or knowledge that conduct will injure the plaintiff's business dealings is insufficient to impose liability." *Genetic Sys.*, 691 F.Supp. at 423. Plaintiff cannot establish liability without a "strong showing of intent" to disrupt ongoing business relationships. *Id.* Bennett's evidence in this case does not meet that standard.

Through the testimony of Meeks and Duignan and the rest of its evidence, Bennett has established at most that Domino's, through the legitimate disclosure of truthful information in the ordinary course of business, contributed to Bennett's failure to sell its troubled enterprise for as high a price as it wished. Nothing in the evidence supports more than the rankest speculation that Domino's or anyone acting on its behalf harbored any ill motive or intent to disrupt Bennett's economic advantage. Because the claim was not made out as a matter of law, the jury's verdict must be reversed.

In light of our conclusion that Bennett did not establish liability, we need not address the parties' arguments on the proper methods for calculating damages or on the propriety of awarding punitive damages.

### III. CONCLUSION

Based on the foregoing reasons, we conclude that Domino's did not breach the franchise agreement by placing Bennett in de-

fault, and that Bennett failed to proffer sufficient evidence upon which a jury could properly base a verdict in its favor for the remaining breach of contract and tortious interference with prospective economic advantage claims. Accordingly, the judgment is reversed.