**AFFORDABLE ELEGANCE TRAVEL, INC., Appellant**

v.

**WORLDSPAN, L.P., Appellee.**

No. 97–CV–57.

District of Columbia Court of Appeals.

Argued Feb. 25, 1998.

Decided June 14, 2001.

---

Curt S. Hansen, Washington, DC, for appellant.

Mitchell B. Rosenfeld, for appellee.

Before TERRY, SCHWELB, and FARRELL, Associate Judges.

TERRY, Associate Judge:

Worldspan, L.P., sued Affordable Elegance Travel, Inc. ("AET"), a travel agency, for money due under a lease agreement. The case was tried to the court, sitting without a jury. At the close of Worldspan's evidence, AET moved for a directed verdict,[1] which was denied. The trial proceeded, and after hearing AET's evidence, the court found AET liable to Worldspan but continued the case to a future date for a further hearing on damages. At the conclusion of that hearing, the court awarded $27,559.73 to Worldspan. AET filed a motion, based on Super. Ct. Civ. R. 59(e), to alter or amend the judgment or, in the alternative, for a new trial. The court ruled, however, that the motion was not timely filed under Rule 59(e). It considered the motion instead under Super.Ct.Civ.R. 60(b) and denied it in its entirety. We hold that the motion was timely, and thus we remand the case to the trial court with directions to reconsider the motion under Rule 59. We reject AET's other contentions and affirm the judgment on the merits. Our affirmance, however, is subject to the trial court's ultimate decision on remand with respect to the post-trial motion.

I

On August 20, 1989, PARS Marketing ("PARS"), a general partnership, executed a contract in which it agreed to lease an automated computer airline reservation and ticketing system and provide other services to AET over a period of five years. The contract became effective on October 13, 1989, after the equipment was installed and operational. When PARS

---

1. The trial court correctly treated this motion as a motion to dismiss under Super.Ct.Civ.R. 41. "A defendant's motion for judgment at the close of the plaintiff's evidence in a non-jury case ... is governed, not by the Super.Ct.Civ.R. 50(a) directed verdict standard but, rather, by Super.Ct.Civ.R. 41(b) providing for involuntary dismissal." *Bay General Industries, Inc. v. Johnson*, 418 A.2d 1050, 1054 (D.C.1980) (citations omitted).

was later acquired by Worldspan, a company whose business (according to one of its witnesses at trial) "is to lease equipment and services to travel agencies," Worldspan assumed the contract.

At trial there was a dispute about the identity of the other party to the contract. Edward Mascoll, who owned a New York company named Travel Associates, Inc.,[2] along with his wife, and later established AET in the District of Columbia, testified that he negotiated the contract with PARS. AET maintained that it was not liable under the contract because Mr. Mascoll had signed the contract on behalf of Travel Associates, not AET. Mr. Mascoll stated that he incorporated AET in the District of Columbia in 1989 and wanted PARS to provide him with equipment so that he could begin to operate AET as a travel agency.[3] However, because AET did not yet have authority from the Airlines Reporting Commission to issue tickets,[4] it was linked by computer to Travel Associates in New York, which issued tickets on AET's behalf. Mr. Mascoll described AET as "basically a holding company for transactions that Travel Associates had created in the Washington area." He testified that he "wanted to branch into the Washington area, and the only way they would consider giving me a computer reservation system was that I had to negotiate the original contract and then bridge the new site on as well." There-

fore, he said, PARS advised him that it would execute two contracts with Travel Associates, one for the New York business and one for the District of Columbia business.[5] The District of Columbia contract is at issue in this case.

Mr. Mascoll testified that he received two copies of the District of Columbia contract. Both copies named "Travel Associates, Inc." as the "Customer." On one copy, Mr. Mascoll wrote in by hand the name "Affordable Elegance Travel" on the contract next to the word "Customer" in two places, page 1 and page 9; on the other copy, however, he wrote AET's name on page 1 only. In addition, on page 10 of both copies of the contract, Mr. Mascoll wrote "July 27, 1989 Wash. D.C.," the date and location of AET's incorporation, on the line seeking incorporation information for the "entity" entering into the contract.

Cheryl Sampson executed the contract on behalf of PARS.[6] She testified that Mr. Mascoll gave her permission to modify the contract to name AET, rather than Travel Associates, as the other contracting party and instructed her to write in the name "Affordable Elegance" and initial it. Ms. Sampson specifically stated, "[W]hen I received the contract, I noticed the different name on it, [and] I contacted Mr. Mascoll by telephone to inquire as to what the correct name should be and was advised it's Affordable Elegance." Mr. Mascoll de-

2. Travel Associates ceased to exist sometime in early 1993.

3. Mr. Mascoll and his wife, the other officer and owner of Travel Associates, were in the process of divorcing. As part of their divorce settlement, they agreed that Mr. Mascoll would operate a travel agency in the District of Columbia and that Mrs. Mascoll would continue to operate Travel Associates in New York.

4. AET did not receive such approval until July 1993.

5. Mr. Mascoll said that PARS informed him that it would not contract with a company which was not certified by the Airline Reservation Commission. Cheryl Sampson, who represented PARS in the contract negotiations, denied having made such a statement and testified that such certification was not a prerequisite to contracting with PARS.

6. At the time of the contract, Ms. Sampson was a sales and services specialist for PARS; at the time of trial, she was district manager for Worldspan.

nied ever having had such a conversation with Ms. Sampson.

The two copies of the contract, Plaintiff's Exhibit 1 and Defendant's Exhibit 1, reveal that Ms. Sampson did not make identical changes in each copy. On the copy that she signed and sent to Mr. Mascoll, Defendant's Exhibit 1, she simply placed the letters "d/b/a" in front of the place where Mr. Mascoll had written "Affordable Elegance Travel" on page 1. On the copy that PARS kept, Plaintiff's Exhibit 1, she (or someone else at PARS) drew a line through "Travel Associates, Inc." and "d/b/a" on pages 1, 9, and 10 of the contract.

On October 13, 1989, the leased equipment was installed at AET's place of business, and AET began to pay the monthly rental fee. In January 1993, however, AET defaulted on the contract by failing to make the required monthly payment. According to Mr. Mascoll, AET was having financial difficulties because Travel Associates had ceased to do business and was no longer paying commissions to AET. Worldspan terminated the contract and, on February 20, 1993, sent AET a bill stating that AET owed Worldspan $37,823.54, including a past due balance of $6,061.60.

Mr. Mascoll, as managing director of AET, wrote three letters to Worldspan on AET stationery dated January 11, February 13, and March 9, 1993. Each letter complained about Worldspan's termination of the contract and the severe economic consequences that it had for AET. Mr. Mascoll testified that at some point after the contract had been terminated, a man came to AET's offices to remove the leased equipment, but when Mr. Mascoll "asked him to please give me his identification and also would he be kind enough to give me a receipt of what he was taking out, he said absolutely—looked at me like I was crazy and walked out, and the equipment is still in that office today in the back room. . . .

I've called them. They didn't respond, and I just, as I said, the equipment is there."

AET introduced a statement that Worldspan sent to AET on November 15, 1994, which reflected a credit of $37,823.54 and stated that the new balance of AET's account was zero. Debra Talbot, an accountant at Worldspan, testified that this credit was given because "it was deemed that we would not be able to collect internally, and it is company policy and procedure to use an outside counsel for our collection efforts. Our collection policy and procedure is at the point that those files are sent outside of the company, we transfer any balances on our active records to a separate account. We call this our write-off account. . . . So it does not mean there is not an actual balance due; it just means that we are no longer actively trying to collect that money." In addition, she said, the statement "was sent [to AET] in error."

## II

■ AET contends that the trial court "should have found as a matter of law that [AET] was not a party to this contract." The court actually ruled just the opposite: that AET was a party because, it found, Mr. Mascoll was acting as AET's agent (not the agent of Travel Associates) when he entered into the contract with PARS.

[T]he court concludes, largely based on Ms. Sampson's credible testimony and the entry on page 10 [of the contract] of the date and place of incorporation of Affordable Elegance, that . . . the mutual obligations under this contract were the obligations of PARS and its assignee Worldspan LP and Affordable Elegance Travel, Incorporated.

. . . [F]or reasons that I'll denote as internal accounting, the company that

Mr. Mascoll operated in Washington, he operated through Travel [Associates], Inc., the original company, for his own personal reasons. But I think that it is beyond a mere preponderance but clear and convincing evidence in this record that, originally and at all times, the plaintiff and defendant were dealing with each other as PARS, and then Worldspan, and Affordable Elegance Travel, Incorporated. There is nothing other than ... what I've euphemistically designated as internal accounting that motivated [Mr. Mascoll] to do business in the name of Travel Associates. He had actually moved away from that, except for his personal obligations, and was for all the public Affordable Elegance Travel, and he was to the plaintiff Affordable Elegance Travel.

There was ample evidence to support the court's findings. Ms. Sampson testified that Mr. Mascoll specifically told her that he was acting on behalf of AET. Although AET presented contradictory testimony, it was within the province of the court, as trier of fact, to believe Ms. Sampson. In addition, both copies of the contract indicated that Mr. Mascoll was acting as an agent for AET. For example, on page 10, Mr. Mascoll himself wrote the date and place of AET's incorporation on the line seeking incorporation information about his principal. Even Mr. Mascoll's own testimony shows that AET, rather than Travel Associates, was the entity set up to do business in the District of Columbia and that PARS insisted on two separate contracts, one for the New York business (with Travel Associates) and one for the District of Columbia business (with AET).

■ When one person acts as the agent of another, the identity of the principal is a question of fact, as is the issue of whether the agency itself was disclosed to the other party to the transaction. *See American*

*Insurance Co. v. Smith,* 472 A.2d 872, 874–875 (D.C.1984). The trial court, sitting as trier of fact, found that Mr. Mascoll was AET's agent and that he disclosed that fact to Ms. Sampson. The evidence supported both of these findings. D.C.Code § 17–305(a) (1997) provides that when a case is tried without a jury, "the [appellate] court may review both as to the facts and the law, but the judgment must not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." *See also, e.g., Butler v. Whitting,* 647 A.2d 383, 384 (D.C.1994). On the present record, we cannot say that the findings which AET challenges are clearly erroneous or "plainly wrong." We therefore reject AET's contention that AET was not proven to be a party to the contract.

### III

■ AET contends that the trial court erred in admitting what it characterizes as parol evidence to determine the correct party to the contract because "there was no ambiguity in the terms of the contract." The trial court rejected this argument, stating:

> If we're talking about interpretation of the terms of the contract, then you could invoke your parol evidence rule. But we're talking here about who were the parties. Your parol evidence rule is inapplicable. In determining who are the executing parties here, it is-I think it is quite appropriate for me to determine at the time that this contract was entered, particularly where you're talking about an individual who is the fifty percent shareholder of one corporation and apparently the other entity is wholly owned by himself.... So with someone who has the ability to sit at a table and be three different people at once, I think that is altogether appropriate for the

court to determine who the other parties thought they were dealing with. And it is not a violation of the parol evidence rule.

Under the parol evidence rule, "[e]xtrinsic or parol evidence which tends to contradict, vary, add to, or subtract from the terms of a written contract must be excluded." *Fistere, Inc. v. Helz,* 226 A.2d 578, 580 (D.C.1967) (citations omitted); *accord, e.g.,* 17A AM.JUR.2D *Contracts* § 402 (1991) ("parol evidence is inadmissible to vary or contradict the terms of a valid, and plain and unambiguous, written contract").[7] But the rule applies only to the actual terms of the contract itself, not to the preliminary determination of who the contracting parties were. "If a document is facially unambiguous, its language should be relied upon as providing the best objective manifestation of the parties' intent." *1010 Potomac Associates v. Grocery Manufacturers of America, Inc.,* 485 A.2d 199, 205 (D.C.1984). The identity of the parties is a different matter entirely, and, as the trial judge recognized, the parol evidence rule has no bearing on that question. Indeed, the rule applies only to written contracts that have been "duly signed and executed," *Gagnon v. Wright,* 200 A.2d 196, 198 (D.C.1964), and before a contract may be regarded as "duly signed and executed," the identity of the parties must be established, or at least there must be evidence from which a trier of fact could ascertain their identity if it is in dispute. Thus we hold that in this case, because the identity of one of the parties to the contract was at issue, the trial court did not err in admitting the testimony of Ms. Sampson which directly addressed that issue. *See Becker v. Farmers' Mutu-*

*al Fire Insurance Co.,* 99 S.W.2d 148, 153 (Mo.App.1936) (upholding admission of extrinsic evidence to identify the insured under a contract of insurance).

As for the contract itself, AET contends that it was so ambiguous that it was unenforceable, and that in any event any ambiguity should have been resolved against Worldspan, the successor in interest to the actual drafter (PARS). AET relies solely on Missouri law to support these contentions, stating that the contract specified that it was to be construed under Missouri law. The trial court concluded that there was no choice-of-law issue because its decision would be the same under either Missouri or District of Columbia law. *See Cellular Radio Corp. v. OKI America, Inc.,* 664 A.2d 357, 359 n. 2 (D.C.1995) (declining to address a choice-of-law issue because "the result is the same under New Jersey law and District of Columbia law").

 This court has stated that, in order to be enforceable, "a contract must be sufficiently definite as to its material terms (which include, *e.g.,* subject matter, price, payment terms, quantity, and duration) that the promises and performance to be rendered by each party are reasonably certain."[8] *Rosenthal v. National Produce Co.,* 573 A.2d 365, 370 (D.C.1990) (citation omitted); *see also Georgetown Entertainment Corp. v. District of Columbia,* 496 A.2d 587, 590 (D.C.1985). If the terms of the contract are clear enough for the court to determine whether a breach has occurred and to identify an appropriate remedy, it is enforceable. *Rosenthal,* 573 A.2d at 370 (citation omitted). Because the contract in this case was definite as to all of its material terms and enabled the court to determine whether a breach had occurred

---

7. We note that "the parol evidence rule is a matter of substantive law, not a mere rule of evidence." *Ozerol v. Howard University,* 545 A.2d 638, 641 (D.C.1988) (citations omitted).

8. Whether a contract is enforceable is a legal issue that this court considers *de novo. Hart v. Vermont Investment Ltd. Partnership,* 667 A.2d 578, 582 (D.C.1995).

and to determine a remedy (*i.e.*, to calculate damages), we hold that the trial court did not err in rejecting AET's argument the contract was so ambiguous as to be unenforceable.

But if the contract was enforceable, says AET, it should have been construed against PARS and Worldspan as the drafter of the document. It is settled law that any ambiguity in a contract will be construed against the drafter. *See, e.g., Sagalyn v. Foundation for Preservation of Historic Georgetown,* 691 A.2d 107, 114 (D.C.1997). This court has held, however, that it is "appropriate ... to consider the contract first under the reasonable person standard and then, if no result is reached, to apply the rule [construing the contract against the drafter] as a rebuttable presumption."[9] *1901 Wyoming Avenue Cooperative Ass'n v. Lee,* 345 A.2d 456, 463 (D.C.1975). Missouri law is to the same effect.[10] In this case, as we have seen, there was sufficient evidence to enable a reasonable person to determine the intent of the parties. Indeed, the principal issue at trial involved not the terms of the contract but the identity of one of the parties. We hold, therefore, that the trial court did not err in concluding that there was no ambiguity in the terms of the contract and hence no need to apply the presumption.

## IV

AET contends that the trial judge "unduly assisted and favored" Worldspan by continuing the trial for additional proof on the issue of damages. According to AET, the continuance showed that the judge was improperly biased toward Worldspan. The record refutes this assertion. The judge's statements make clear that he continued the case solely to determine the value of the leased equipment, which remained in AET's possession, and that Worldspan had adequately proven other damages:

> I think that [Worldspan's] other charges are all within the contract and proved under the contract. But I think that there would have to be evidence of the value of the equipment. I don't think I can simply take an invoice. That's not the way you prove value. And beyond that, I don't think I can ignore the testimony that the equipment is sitting there ready to be picked up. So I'm going to give you some time to figure that out.

After AET's counsel objected to the continuance, the following occurred:

> THE COURT: That's a good point. I hate to continue things myself. But it could go very bad for your client if I just entered the damages based on this invoice.
>
> MR. HANSEN [counsel for AET]: Your Honor, if you were to enter the damages based on this invoice, I think I have a very good basis for appeal.
>
> THE COURT: I couldn't argue with you on that. On the other hand—okay, if you have got eleven thousand four hundred ninety-nine dollars worth of equipment you're going to return, then, you

---

**9.** The trial court did not state whether it applied a presumption in favor of AET; however, it appears from the court's comments that even with such a presumption, it would have come to the same conclusion. See the language quoted at page 325–26, *supra*.

**10.** *See Specialty Restaurants Corp. v. Gaebler,* 956 S.W.2d 391, 395 (Mo.App.1997) (*"When all else fails,* 'an agreement that is ambiguous should be construed against the drafter' " (citations omitted; emphasis added)); *Aluminum Products Enterprises, Inc. v. Fuhrmann Tooling & Manufacturing Co.,* 758 S.W.2d 119, 124 (Mo.App.1988) (contract will be construed against the drafter only "when other means of construction fail and there is an absence of other evidence to show what the parties intended" (citations omitted)).

see, I can credit you for that. But I can't credit you with it until you have returned it.

At the subsequent hearing on damages, the judge stated again that he had continued the case in the hope that Worldspan would have an opportunity to retrieve the equipment, so that he would not have to consider its value in calculating damages.

On this record there is no basis for concluding that the judge was biased, *i.e.*, that "the impartiality of the judge might reasonably be questioned." *Talley v. Varma*, 689 A.2d 547, 550 n. 1 (D.C.1997) (citations omitted). On the contrary, it is evident from the transcripts that the judge did not continue the proceeding in order to grant Worldspan an unfair advantage; on the contrary, he did so in the hope that AET would return the equipment to Worldspan and thus would be subject to a lesser award of damages.[11] AET's claim of bias is entirely unfounded.

### V

AET contends that the evidence was insufficient to show that Worldspan was entitled to damages in the amount of $27,559.73. On that subject the judge said:

> I arrived at that figure by accepting the Plaintiff's Exhibit 2, which is their customer statement, and adjusting the equipment rent through contract term from the standard rate that Ms. Talbot testified that the person preparing for this lawsuit used, which was $524. I adjusted downward the $294 figure that

the Defendant had expected, and that the Plaintiff had contemplated based upon the expectation that the contract would have been fulfilled.

> Why did I make that adjustment downward? Because it is the value at which these two parties bargained. And notwithstanding the breach by the Defendant, there is no other substantive evidence to establish the value except the evidence that that's what they agreed to. . . .

> The other charges, which include the equipment that's now in possession of the Defendant, can be used to adjust this judgment downward further if the Defendant ships the equipment back to the Plaintiff.

Under District of Columbia law, "[a] plaintiff need prove damages only with reasonable certainty." *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 549–550 (D.C.1981) (citations omitted); *see W.G. Cornell Co. v. Ceramic Coating Co.*, 200 U.S.App. D.C. 126, 129, 626 F.2d 990, 993 (1980) ("the fact of damages and a reasonable estimate must be established" (citations omitted), *cited with approval in Cahn v. Antioch University*, 482 A.2d 120, 130 (D.C.1984)). The trial court's award will be upheld as long as it is a "just and reasonable estimate based on relevant data," even if it is not proven with mathematical precision. *LaVay*, 431 A.2d at 550; *accord, e.g., Romer v. District of Columbia*, 449 A.2d 1097, 1100 (D.C.1982).

In this case, Worldspan relied on three evidentiary sources to prove its damages: (1) the contract itself;[12] (2) the February

---

11. Because AET did not return the equipment, the judge ultimately included its value, $11,146.00, in the damages award, but stated nevertheless that AET would receive a credit in that amount if it returned the equipment to Worldspan.

12. Section 12(f) of the contract provides:

> In the event that, prior to the expiration of this Agreement, Customer is in default of this Agreement and it is terminated as a result thereof, Customer shall promptly pay to [PARS] . . . liquidated damages in an amount calculated as follows:
> (i) eighty percent (80%) of the amount of total monthly charges set forth in this

2, 1993, customer statement from Worldspan to AET, which stated that AET owed Worldspan $37,823.54; and (3) the testimony of Debra Talbot, a Worldspan employee, at the hearing on damages, in which she explained the contractual provision and the customer statement. Ms. Talbot's testimony established that the rental cost of the equipment through the term of the contract was $15,889.81.[13] Adding that figure to the amounts set forth in the customer statement (Plaintiff's Exhibit 2) and the value of the unreturned equipment itself, we find ample basis in the evidence for the figure that the court came up with, particularly when the court's explanation of its award, quoted above, is taken into account. Applying the relevant case law, we find no error in the damages award.

## VI

On October 18, 1996, the court rendered a judgment in favor of Worldspan in the amount of $27,559.73. That judgment was not entered on the docket, however, until October 23. On November 1, nine calendar days later, AET filed a motion to alter or amend the judgment or, in the alternative, for a new trial, citing Civil Rule 59. In its motion AET challenged the judg-

ment on various grounds and also alleged that it had certain newly discovered evidence which, it maintained, would entitle it to a new trial.[14] Worldspan filed a response on November 12, contending *inter alia* that the motion was untimely and contesting AET's other assertions. The court denied the motion under Rule 59 on the ground that it "was not timely filed within 10 days of entry of the judgment. . . ." However, it did consider the motion under Rule 60(b), but denied the motion under that rule as well because it "[did] not now find any extraordinary circumstances or undue hardship upon the Defendant to justify relief in the form of altering or amending the judgment."

■ Under Rule 59(b) and (e), any motion for new trial, or any motion to alter or amend the judgment, "shall be filed no later than 10 days after entry of the judgment." But because a judgment is not effective until it is entered on the docket "as provided in Rule 79(a)," *see* Super.Ct.Civ.R. 58, this court has held that "the controlling date for purposes of computing the ten-day period is . . . the date on which the order was docketed by the Clerk." *Vincent v. Anderson,* 621 A.2d

Agreement on any Schedule or Schedules attached hereto multiplied by the number of months remaining on the term of this Agreement; plus

(ii) an amount equal to the Customer's actual average number of net airline bookings per month through the PARS System . . . plus

(iii) any previously unreimbursed costs incurred by PARS in connection with this Agreement including, but not limited to, training, installation, removal, modification of Equipment and Equipment rental or other charges waived or amount advanced by [PARS] based upon Customer's delivery of this Agreement.

13. Ms. Talbot stated, *inter alia:*

Basically, the equipment was shown at a standard fee of $524 a month, and the dis-

counted fee was, on this piece of paper, $294 a month. And the difference in those two calculations times the remaining months of the contract . . . less our cost of doing business of 20%. . . .

14. Along with the motion, AET submitted an affidavit of Mr. Mascoll stating that he, identifying himself as "Ed Jones," had called Worldspan and inquired whether it would lease equipment to an unaccredited travel agency, and was informed that Worldspan "would give the agency a ninety-day grace period to receive ARC accreditation; however, if the new agency was not accredited within that time, then its failure to be accredited would be considered a breach of the contract. . . ."

367, 371 (D.C.1993); *see* Super.Ct.Civ.R. 79(a) (outlining procedures for entry of order or judgment by clerk). In this case, the judgment was not docketed until October 23, 1996; AET's motion was filed on November 1, 1996.

Super.Ct.Civ.R. 6(a) establishes the procedure for computing time:

> In computing any period of time prescribed or allowed by these rules ... the day of the act, event, or default shall not be included. The last day of the period so computed shall be included.... When the period of time prescribed or allowed is less than 11 days, *intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation.* [Emphasis added.]

Because October 23, 1996, was a Wednesday, the date on which the motion was filed, November 1, was only the seventh day (excluding Saturday and Sunday) after entry of the judgment, and the motion was timely. Indeed, even if the date of the court's actual ruling—Friday, October 18—were considered as the date of the judgment, November 1 was only the tenth day (excluding two Saturdays and two Sundays) after that date, and the motion would still have been timely. Consequently, the trial court erred in denying the motion as untimely under Rule 59.[15]

■ The court, erroneously believing AET's motion to be time-barred under Rule 59, considered the motion under Rule 60(b), which has longer time limits.[16] The court in its discretion may do so if a Rule 59 motion is not timely filed, *see State Farm Mutual Automobile Insurance Co.*

*v. Brown,* 593 A.2d 184, 185 (D.C.1991), so long as the content of the motion could have been considered under Rule 60 rather than (or in addition to) Rule 59. Thus we must determine whether the motion was really a Rule 59(e) motion or a Rule 60(b) motion, or whether it might possibly fit within either rule.

■ This court has often stated that "[t]he nature of a motion is determined by the relief sought, not by its label or caption." *Wallace v. Warehouse Employees Union,* 482 A.2d 801, 804 (D.C. 1984) (citations omitted). In determining whether a motion was made under Rule 59(e) or Rule 60(b), the court examines "whether, for the first time, the movant is requesting consideration of additional circumstances; if so, the motion is properly considered under Rule 60(b), but if the movant is seeking relief from the adverse consequences of the original order on the basis of error of law, the motion is properly considered under Rule 59(e)." *Id.* If a motion would be proper under either rule, this court has generally treated the motion "as made pursuant to Rule 59(e) if timely filed under that rule...." *Id.* at 805.

■ In this case, the motion contended in part that the trial court had erred in its legal rulings, which would make it a Rule 59(e) motion. In addition, the motion sought a new trial based on newly discovered evidence, which (if timely) would bring it within Rule 59(b). *See* Rule 60(b)(2). Having determined that the motion was timely filed under Rule 59(b) and

---

**15.** The trial court was apparently led into error by Worldspan, which stated in its opposition to AET's motion that the judgment had been entered on October 18 (when it had actually been entered—*i.e.,* docketed—on October 23), and also failed to recognize that intervening Saturdays and Sundays should not be included in the ten-day calculation.

**16.** Rule 60(b) has six subdivisions. A motion for relief from judgment under subdivisions (1), (2), or (3) must be filed within a year from the date of entry of the judgment; in other cases the motion need only be filed "within a reasonable time."

(e), we hold that AET is entitled to have the trial court consider its motion under the somewhat more lenient standards of that rule, rather than Rule 60(b). In so holding, we follow two recent decisions of this court which we regard as controlling: *Williams v. Vel Rey Properties Inc.*, 699 A.2d 416, 418 (D.C.1997), and *District of Columbia Housing Finance Agency v. Harper*, 707 A.2d 53 (D.C.1998). In *Williams* the trial court denied a motion for reconsideration of an earlier order on the ground that it had not been filed within the ten-day period allotted under Rule 59(e). This court, concluding that the motion was timely and that it otherwise qualified as a Rule 59(e) motion, remanded the case "for reconsideration of the ruling under the proper standard." 699 A.2d at 420–421 (citations omitted). A few months later, in *Harper*, we similarly concluded that the trial court had erred in denying a motion as untimely under Rule 59(e). Following *Williams*, we held that we were "obliged to remand to permit the trial court to rule on the merits of [the Rule 59(e)] motion." 707 A.2d at 57. We follow the same course here.

## VII

Insofar as this appeal is taken from the judgment rendered after trial, the judgment is affirmed. Insofar as it is taken from the denial of the Rule 59(e) motion as untimely, the case is remanded to the trial court for reconsideration of that motion on the merits, in accordance with *Williams* and *Harper*. If the trial court on remand concludes that AET is entitled to relief, it may vacate all or part of the judgment or enter such other order as it deems appropriate.

*Remanded for further proceedings.*