**Maria C. LUMPKINS and CSL Property, LLC, Appellants,**

v.

**CSL LOCKSMITH, LLC, Appellee.**

No. 05–CV–1085.

District of Columbia Court of Appeals.

Argued Oct. 12, 2006.

Decided Nov. 22, 2006.

FARRELL, Associate Judge:

This appeal is from the grant of summary judgment to appellee CSL Locksmith, LLC in an action brought by appellant Maria C. Lumpkins for, *inter alia,* a declaratory judgment regarding the meaning and validity of a commercial lease under which CSL Locksmith occupies, and claims the right to occupy, a building. On appeal, Ms. Lumpkins—together with appellant CSL Property, LLC—contends that triable issues of fact remain concerning (1) the meaning of the termination clause of the lease in light of the circumstances surrounding its drafting; (2) whether a mistake was made in the signing of the lease such that reformation or rescission is warranted; and (3) whether CSL Locksmith, through its principal Michael Conway, fabricated or altered the lease under which it occupies the building. The trial judge, we hold, correctly concluded that the termination provision of the lease unambiguously supports CSL Locksmith's right to remain in the building, so that a prior unsigned, differing version of that provision would be inadmissible to impeach it. We further hold that appellants proffered insufficient evidence as a matter of law to meet their heightened burden of showing entitlement to rescission or reformation or that the lease in question had been fabricated. We therefore affirm the grant of summary judgment.

## I.

Through a company they formed in 1999 named CSL Property, LLC, brothers John Thomas ("Rocky") and Warren R. ("Bobby") Lumpkins jointly owned a building at 1104 9th Street, N.W. Beginning in March 1999, the building was occupied by CSL Locksmith, LLC, also a company jointly owned by the brothers, under a lease that

Bardyl R. Tirana, Washington, DC, for appellants.

Nelson C. Cohen, with whom D. Allison Baker, Washington, DC, was on the brief, for appellee.

Before FARRELL, RUIZ, and FISHER, Associate Judges.

is the subject of this controversy. According to documentary and deposition testimony presented by the parties, Brett Orlove, Rocky Lumpkins' attorney, prepared successive drafts of the lease, each identified by date. (The respective dates appeared in a "footer" at the bottom of each hard copy page of the computer document.) As relevant here, the drafts differed only with respect to paragraph XIII, entitled Assignment and Subletting, which specified a condition or conditions for termination of the lease by the landlord. The two drafts dated "3/25/99" and "4/16/99" each provided in that paragraph:

> In the event this Lease has been assigned or all of the Premises have been sublet, Landlord shall have the right to terminate this Lease upon ninety days' prior notice to tenant in the event Landlord has executed a valid contract to sell the building.

The "4/19/99" draft, by contrast, defined the right to terminate in paragraph XIII as follows:

> In the event this Lease has been assigned or all of the Premises have been sublet, or in the event Landlord has executed a valid contract to sell the Building, Landlord shall have the right to terminate this Lease upon ninety days' prior notice to Tenant.

A note from attorney Orlove to Rocky accompanying this draft stated, "Revised as discussed," which Orlove testified in deposition reflected changes having "to do with the right to terminate the lease" that he had made after discussion with Rocky.

As they appear in the record, none of the three draft leases was signed by Rocky or Bobby Lumpkins.

In June 1999, Bobby sold his 50% interest in CSL Locksmith to Michael Conway for $300,000, and Rocky and Conway signed an amended Operating Agreement to run CSL Locksmith. When Rocky died unexpectedly in March 2001, the Agreement required CSL Locksmith (through Conway as sole surviving member) to buy out Rocky's 50% share. Conway initially balked, and instead filed a claim for $300,000 against Rocky's estate in Maryland Orphans' Court, asserting that Rocky had breached an oral agreement whereby he and Conway would each name the other as beneficiary of $300,000 in life insurance. Conway later dismissed his suit and purchased Rocky's share of the business.

In Spring 2003, Rocky's widow, Maria Concepcion Lumpkins (referred to by the parties as Conchita), received an offer to buy her share of the 1104 9th Street property. When she apparently sought to invoke the termination paragraph of the 4/19/99 draft lease against CSL Locksmith, Conway produced a lease agreement containing a paragraph XIII identical in language to the 3/25/99 and 4/16/99 drafts; this agreement bore a footer date of 6/29/00. The lease was signed under seal by Rocky on behalf of both CSL Property and CSL Locksmith as manager of each; and in keeping with the first two drafts prepared by Orlove, it conditioned the landlord's right to terminate on the twin events of a sale of the building by the landlord and assignment of the lease or subletting of the premises by the tenant. Conway testified in deposition that Rocky had given him the lease in July 2000 after he had asked Rocky several times for a copy.

In November 2003, Conchita brought this suit in Superior Court to enforce the 4/19/99 version of the lease. She sought a declaratory judgment that the 6/29/00 lease Conway had produced was "not authentic and genuine," and that assuming it was genuine, the termination clause was ambiguous, and extrinsic evidence would show that it reflected Rocky's intention to allow termination of the lease upon sale of

the building by CSL Property, without further condition. She further sought rescission or reformation of the lease, alleging that, at most, Rocky had mistakenly executed the lease in June 2000 believing that it was the 4/19/99 version containing his requested modifications.[1]

Following discovery, the trial court granted summary judgment to CSL Locksmith as to each of Conchita's claims relevant here, giving rise to this appeal.

## II.

 We consider first appellants' contention that the termination clause of the 6/29/00 lease executed by Rocky is ambiguous, thus creating triable issues of fact concerning Rocky's understanding in executing the lease.[2] Paragraph XIII of the 6/29/00 lease again states:

> In the event this Lease has been assigned or all of the Premises have been sublet, Landlord shall have the right to terminate this Lease upon ninety days' prior notice to Tenant in the event Landlord has executed a valid contract to sell the Building.

Appellants assert three reasons why this provision is ambiguous: (1) "The language is confusing because the words 'in the event' are used twice"; (2) "The reasonable inference" from Orlove's April 19, 1999, revision of the lease after discussion with Rocky is that "the Landlord was to have the right to terminate the lease if it

contracted to sell"; and (3) "[T]he purported lease was not integrated and does not contain a merger clause," and "whether the lease is a completely integrated contract by itself is an issue of fact which should have resulted in the denial of . . . summary judgment." We consider these points in turn after briefly stating the relevant legal standards.

Our review of an order granting summary judgment is *de novo*. Summary judgment is appropriate where a contract is unambiguous since, absent such ambiguity, a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence. Whether a contract is ambiguous is a question of law. A contract is not ambiguous merely because the parties disagree over its meaning, and courts are enjoined not to create ambiguity where none exists. . . . While it is commonly said that contracts are to be construed to effectuate the intent of the parties, where a contract is unambiguous, intent is properly an objective, not subjective, issue.

*Washington Props., Inc. v. Chin, Inc.*, 760 A.2d 546, 548 (D.C.2000) (internal quotation marks, brackets, and citations omitted); *see also Brown v. Union Station Venture Corp. No. P–5*, 727 A.2d 878, 881 (D.C.1999) (only where contract is ambiguous may "an 'objective interpretation' . . . require evidence of the parties' intent re-

---

1. Separately, Conchita's suit named CSL Property and Bobby as defendants, and as to them she sought dissolution and winding up CSL Property, alleging also a breach of the CSL Property Operating Agreement insofar as it required liquidation and winding up in case either of the members died. These portions of the suit were later dismissed voluntarily, and are not before us.

2. We reject appellee's argument that CSL Property lacks standing to bring this appeal.

Although only Conchita sued CSL Locksmith, it is not disputed that in the meantime Conchita, Bobby, and CSL Property have resolved their disagreement, see note 1, *supra*, and elected to continue CSL Property's existence. Thus, Conchita and CSL Property are now allied in challenging the trial court's decision upholding the 6/29/00 lease, and CSL Property is consequently a "party aggrieved" who may appeal under D.C.Code § 11–721(b) (2001).

garding the meaning of term(s), thus presenting a question of fact").

■ Paragraph XIII of the 6/29/00 lease is unambiguous, and is not—as appellants argue—made equivocal merely by its double use of the words "in the event." The repetition of that phrase may have been inartful drafting, but the paragraph creates two clear, express limitations on the landlord's right to terminate: the landlord must have contracted to sell the building, and the lease must have been assigned or the premises sublet. Appellants nonetheless argue that this facial unambiguity is belied by the record indications that Rocky would not have "intended to tie up his own assets by precluding CSL Property's sale of the building so long as CSL Locksmith was the tenant." For example, they point to an initial letter by attorney Orlove describing one purpose of the creation of the two separate companies to be to "facilitate the transfer of interests in one or either of the two entities." They also cite to the 4/19/99 draft broadening the landlord's right to sell which Orlove prepared after discussion of earlier drafts, and the termination clause in particular, with Rocky—and which was the last draft Orlove prepared. However, it is precisely this sort of extrinsic evidence that unambiguous contractual language makes it unnecessary, and improper, to consider. *See Chin,* 760 A.2d at 548 (unambiguous contract language "speaks for itself and binds the parties without the necessity of extrinsic evidence"). We have long held that, "[u]nder the parol evidence rule, '[e]xtrinsic or parol evidence which tends to contradict, vary, add to, or subtract from the terms of a written contract must be excluded.'" *Affordable Elegance Travel, Inc. v. Worldspan,* 774 A.2d 320, 327 (D.C. 2001) (citation omitted);[3] *see also, e.g., Sutton v. Banner Life Ins. Co.,* 686 A.2d 1045, 1049 (D.C.1996) ("Essentially, the parol evidence rule excludes ... evidence of prior and contemporaneous agreements unless the terms of the agreement are ambiguous"). As a historical fact, it may be improbable that Rocky as co-owner of CSL Property intended to limit his ability to sell the building in the way the 6/29/00 lease provides (although Rocky was also— it should not be forgotten—co-owner of the business occupying the building), but it is that sort of evidence of "subjective" intent of a party not reflected in his words that may not impeach the unequivocal language of a written and signed agreement.

### III.

■ At the same time, extrinsic or parol evidence is admissible to prove a mutual mistake of fact, *see, e.g.,* 6 CORBIN ON CONTRACTS § 580, at 136 (2002), and appellants accordingly argue that the circumstances surrounding creation of the lease would permit a reasonable trier of fact to conclude that in signing the 6/29/00 lease, Rocky mistakenly thought he was signing the 4/19/99 version of the agreement. The governing law is that, "where an agreement has been reached by the parties but the writing does not accurately express [their] mutual agreement ... ref-

---

**3.** By contrast, when the issue is whether an agreement is completely or partially integrated, and a finding of partial integration is made, parol evidence may be admitted to show "additional *consistent* oral terms" agreed on by the parties. *Ozerol v. Howard Univ.,* 545 A.2d 638, 641 (D.C.1988) (emphasis added); *see also Howard Univ. v. Good Food Servs., Inc.,* 608 A.2d 116, 126 (D.C.

1992) (where agreement is partially integrated, "consistent additional terms may be shown") (internal quotation marks and citation omitted). No argument can be made that the 4/19/99 draft would add "consistent" termination language to the clause of the 6/29/00 lease Rocky signed, and thus appellants' assertion that the executed lease was only partially integrated does not aid them.

ormation is appropriate." *Isaac v. First Nat'l Bank*, 647 A.2d 1159, 1162 n. 9 (D.C. 1994).[4] A finding of mutual mistake, however, "whether to avoid or reform a written agreement, obviously must reflect strictness in interpretation and a high level of proof; otherwise, the parol evidence rule will be swallowed up in [that and similar] exceptions." *Id.* at 1163. Therefore, a mutual mistake must be shown by clear and convincing evidence, *id.*, citing, *inter alia*, 2 FARNSWORTH ON CONTRACTS § 7.5, at 719 (1990); and whether summary judgment on the issue is appropriate must take into account that heightened standard of proof. *See, e.g., Nader v. de Toledano*, 408 A.2d 31, 42 (D.C.1979) (summary judgment is properly granted if no triable issue of fact exists "under the appropriate burden of proof").

■ Appellants posit a sequence of inferences that a factfinder might draw which simply do not rise to clear and convincing evidence. Because, according to Conway, Rocky told him he had the lease at home and would give it to him, "[a]n inference arises"—appellants say—"that Rocky searched for the '4/19/99' document and could not find it"; "a further inference arises that [the 6/29/00 lease] was printed on that date by someone with electronic access to the '4/16/99' draft which Rocky [had] rejected"; and the "final inference is that Rocky signed the '6/29/00' lease in the mistaken belief that it was the same as the '4/19/99' lease which Rocky could not find." Rocky, of course, would not be available to testify to any of this, and the sequence of inferences ultimately goes back to the claim that the drafting circumstances belie any plausible intent by Rocky to limit his ability to sell the building. Appellants' argument supposes that Rocky, although concerned about the termination language and insistent in 1999 that it be changed to maximize his ability to sell, was yet insouciant enough about the matter a year later to sign the lease (or a new copy of it) without re-familiarizing himself with the termination language. To allow those inferences the weight of clear and convincing evidence sufficient to create triable issues of fact would, as we said in *Isaac*, allow the parol evidence rule to be swallowed up by the mistake exception. *See* 647 A.2d at 1163. The argument for rescission or reformation was therefore properly rejected.

## IV.

■ Finally, appellants alleged in the trial court, and argue here, that triable issues exist about whether the 6/29/00 lease is "authentic and genuine" or instead a "fabricated or altered" document in which, while the signature page bore Rocky's genuine and original signature, "the prior 17 pages of the document [had been] substituted by Conway to perpetrate a ... fraud on his partner's widow." Appellants disavow any claim that Rocky's signatures on the 6/29/00 lease are forged. *See* Reply Br. for App. at 8 ("[T]he complaint did not allege a forgery."). And to the extent they claim that the document was nonetheless fabricated to defraud Conchita, they run up against the standard of proof already discussed, because "fraud must be established by clear and convincing evidence." *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C.1977). More to the point, perhaps, the lease from CSL Property to CSL Locksmith was for a term of ten years, and D.C.Code § 42–306(b) (2001) provides that creation of an interest in real property for a longer term than one year must be by a "deed signed and sealed by

---

4. Although the alleged mistake here is somewhat loosely termed "mutual" since the same person—Rocky—signed the agreement as landlord and tenant, we assume full application of the doctrine for present purposes.

the ... lessor." Thus the 6/29/00 lease, signed and sealed by Rocky as manager of both entities, constituted a deed, and because "a deed conveying real estate is one of the most solemn instruments known to the law[, ... t]here is a presumption that it is what it purports to be on its face ... and one who endeavors to prove otherwise must satisfy the 'clear and convincing' burden of proof." *Hertz v. Klavan*, 374 A.2d 871, 873 (D.C.1977), citing *Smart v. Nevins*, 298 A.2d 217, 219 (D.C.1972).

■ Appellants mistakenly rely on D.C.Code § 42–401 (2001) to contend that the lease was not a valid deed because, though signed and sealed, it had not been "acknowledged and certified" as that section requires.[5] But § 42–401 in essence deals with acknowledgment, certification, *and recordation* as protections for "creditors and subsequent bona fide purchasers," specifying that against those persons "a deed conveying an interest in real property is not effective ... unless it is recorded." *Clay Props., Inc. v. Washington Post Co.*, 604 A.2d 890, 894 (D.C.1992) (en banc). Those requirements do not bar the operation of a signed, sealed, and delivered deed against parties and their assignees. *See Munsey Trust Co. v. Alexander, Inc.*, 59 App. D.C. 369, 42 F.2d 604 (1930).[6]

Beyond the circumstances previously described which fall short of showing that Rocky mistook the 6/29/00 lease for the 4/19/99 version more favorable to his right to terminate, the only evidence appellants point to that Conway fabricated the 6/29/00 lease (*i.e.*, its termination language) is his conduct related to the claim he filed in the Maryland Orphans' Court against Rocky's estate. There, it will be recalled, he asserted that Rocky had breached an agreement for the two men to name each other as beneficiary of $300,000 worth of insurance—slightly less than the cost of Conway's required purchase of Rocky's share in CSL Locksmith upon his death. To prove his own compliance with this agreement, Conway tendered a beneficiary form naming Rocky as co-beneficiary of a $500,000 policy together with one Michael Sussman, from whom he had borrowed $200,000 to buy Bobby's share of CSL Locksmith. (Rocky would thus receive $300,000 from the policy if Conway died.) Discovery in a closely related Maryland suit, however, revealed that the insurer's records contained only a beneficiary form naming Sussman, not Rocky, as beneficiary of the $500,000 policy, and at that point Conway withdrew his claim in the Orphan's Court.

■ For present purposes, we do not dispute appellants' assertion that Conway's actions in Maryland were circumstances relevant to his honesty or veracity about which he could be cross-examined at a trial in this case. *See, e.g., Murphy v. Bonanno*, 663 A.2d 505, 509–10 (D.C.1995).

---

**5.** As appellee points out, no claim that the lease was void for failure to meet these statutory requirements was made by Conchita in the trial court. Appellants argue the omissions here only as circumstantial evidence that the document was fabricated or altered.

**6.** At common law, a deed is valid between the parties if signed, sealed, and delivered, though not acknowledged or recorded. The rule of the common law in this particular has been recognized not only by this court, but by the Supreme Court of the United States, that, as between the parties, a conveyance of real property is valid though not acknowledged. This is based upon the well-established principle that the requirements of acknowledgment is of statutory origin and intended merely as authority for the admission of the deed to record; the recording of such an instrument being required for the protection of creditors and purchasers.
*Munsey Trust*, 59 App. D.C. at 370, 42 F.2d at 605 (citations omitted).

And, although Conway's withdrawal of his claim against the estate certainly was not an admission that he had created a "fake insurance document," we assume also that cross-examining him about it would have created a permissible inference that Conway, contrary to his expected denial of fabrication at trial, was at least capable of altering the lease agreement to serve his own purposes. But an allowable inference that he was capable of such conduct is not clear and convincing evidence that he in fact altered the 6/29/00 lease, even taken together with the parol evidence questioning whether Rocky would have signed the lease on which Conway relied.[7] Particularly in light of their concession that Rocky's genuine signature appears on the last page of the 6/29/00 lease Conway tendered, appellants offer no more than con-jecture as to how Conway might have altered the termination language in the lease Rocky signed.[8] It is no doubt unfortunate from appellants' viewpoint that Rocky could not be deposed about the circumstances supporting a "firm belief or conviction" of alteration, see note 7, *supra*, but the evidence they presented supports no more than a suspicion, more or less founded, of fabrication by Conway, which did not meet their burden as a matter of law.

*Affirmed.*

---

**7.** The standard of clear and convincing evidence is "an intentionally elevated one," *Blackson v. United States*, 897 A.2d 187, 195 n. 12 (D.C.2006); unlike the preponderance standard, which "simply requires the fact finder to believe that the existence of the contested fact is more plausible than its non-existence, ... the standard of clear and convincing proof requires evidence that will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re Dortch*, 860 A.2d 346, 358 (D.C.2004) (citations and internal quotation marks omitted).

**8.** Quoting *White v. Luber*, 144 A.2d 774, 776 (D.C.1958), appellants argue that Conway "has exclusive or peculiar knowledge of the crucial facts" about where the 6/29/00 lease originated, and for that reason alone should "be subjected to cross-examination" at a trial.

But, first, only Rocky's death and unavailability enables appellants to make this exclusive knowledge argument, since otherwise Rocky too would possess knowledge bearing on the authenticity of the 6/29/00 lease. Furthermore, a party required to prove fraud or fabrication by clear and convincing evidence may not avoid summary judgment just by asserting that a factfinder, listening to cross-examination, may disbelieve the alleged wrongdoer's denials; otherwise summary judgment would be all but unavailable in a case alleging such conduct. In *White*, the plaintiff-appellee claimed to be a holder in due course of a second trust note, and by law had the burden to show that he had acquired it in that manner once the defendants proved a defect in the title of anyone negotiating it, *see id.* at 777; that situation bears no resemblance to the one appellants assert.